Reed Wayne HAMILTON, Appellant,

v.

Crispus NIX, Warden, and Attorney
General of the State of
Iowa, Appellees.

No. 84–2089.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1986.

Decided Jan. 12, 1987.

464

John C. Wellman, Des Moines, Iowa, for
appellant.

Brent R. Appel, Des Moines, Iowa, for
appellees.

Before LAY, Chief Judge, and
HEANEY, ROSS, McMILLIAN,
ARNOLD, JOHN R. GIBSON, FAGG,
BOWMAN, WOLLMAN, and MAGILL,
Circuit Judges, en banc.

BOWMAN, Circuit Judge.

Reed Hamilton was convicted in Iowa
state court of first degree murder and vol-
untary manslaughter for the deaths of Ca-

thy Larson and Nick Pappas, Jr. The Iowa
Supreme Court affirmed both convictions
on direct appeal. *State v. Hamilton,* 335
N.W.2d 154 (Iowa 1983). Hamilton then
petitioned under 28 U.S.C. § 2254 for a
writ of habeas corpus. He alleged that (1)
key prosecution witnesses and certain evi-
dence admitted at trial were discovered
only because of earlier police violations of
his Fifth and Sixth Amendment rights, and,
thus, being "fruit of the poisonous tree,"
were improperly admitted at trial; (2) im-
proper statements made by the prosecution
during its opening statement and its clos-
ing argument deprived him of a fair trial;
and (3) there was insufficient evidence to
convict him of first degree murder on a
felony murder theory. The District Court[1]
rejected each of those contentions and de-
nied the petition. *Hamilton v. Nix,* Civil
No. 83–454–B (S.D.Iowa June 27, 1984) (un-
published memorandum opinion and order).
Hamilton appealed, and a panel of this
Court, with one judge dissenting, reversed,
holding that the state trial court committed
constitutional error in admitting certain
witness testimony and physical evidence as
part of the prosecution's case. The panel
reasoned that the challenged testimony and
evidence were "fruit of the poisonous tree"
because their discovery and procurement
were "inextricably linked" with the prior
police misconduct, and concluded that the
evidence was not admissible under the "at-
tenuation," "independent source," or "inev-
itable discovery" exceptions to the exclu-
sionary rule. *Hamilton v. Nix,* 781 F.2d
619 (8th Cir.1985) (panel opinion). In so
holding, the panel applied the analysis set
forth in *United States v. Ceccolini,* 435
U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268
(1978). This Court granted the State's peti-
tion for rehearing en banc. For the rea-
sons discussed below, we affirm the Dis-
trict Court's denial of Hamilton's petition
for a writ of habeas corpus.[2]

1. The Honorable Harold D. Vietor, United
States District Judge for the Southern District of
Iowa.

2. Because the facts of this case have been thor-
oughly discussed in the two prior published

opinions, *see Hamilton v. Nix,* 781 F.2d 619 (8th
Cir.1985); *State v. Hamilton,* 335 N.W.2d 154
(Iowa 1983), we will not restate them here.
Instead, we will refer to particular facts as nec-
essary in the course of our analysis.

## I.

Hamilton's first contention is that key prosecution witnesses and evidence admitted at trial were discovered by the police as a result of their prior misconduct; thus, such evidence was "fruit of the poisonous tree" and was improperly admitted at trial. Specifically, Hamilton challenges the admission of (1) Maxine Hamilton's testimony regarding a telephone conversation during which Reed Hamilton confessed to the killings; (2) the trial testimony of Maxine Hamilton and Paul Lincoln regarding a suitcase containing ten pounds of marijuana; and (3) the marijuana itself.

On this appeal the State does not deny that police misconduct occurred.[3] The State's argument is that all the challenged testimony of Maxine Hamilton and Paul Lincoln was nonetheless admissible under the "independent source" exception to the exclusionary rule. We agree that the identity and testimony of Hamilton and Lincoln derived from lawful sources independent of the police misconduct, and, therefore, that the trial court did not err in admitting their testimony.

The trial below was the second in this case. Both Maxine Hamilton and Paul Lincoln refused to testify at the first trial, and, consequently, both were held in contempt of court and sentenced to short jail terms. Both were subpoenaed again to testify at the second trial, and this time both testified on behalf of the prosecution. Maxine Hamilton testified that Reed Hamilton had borrowed a handgun from her about one month before the killings. She testified that on the day of the killings Reed Hamilton carried a blue suitcase into her house and took it downstairs to leave in her basement, but that she never looked into the suitcase. She also testified about her telephone conversation with Reed Ham-

ilton during which he admitted killing Pappas and Larson and asked her to remove the suitcase of marijuana from her house. Paul Lincoln testified that on the day of the killings Reed Hamilton carried a suitcase containing two large green bags into the basement of Maxine Hamilton's house. Lincoln later went to the basement, opened the suitcase, and saw "some kind of tobacco" with a "strange smell."

Under the "fruit of the poisonous tree" doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–18, 9 L.Ed.2d 441 (1963). The Supreme Court, however, has recognized three analytically distinct exceptions to this doctrine. The Court has suggested that the underlying focus of analysis is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* at 488, 83 S.Ct. at 417 (citation omitted). Thus, under the "independent source" doctrine, the challenged evidence will be admissible if the prosecution can show that it derived from a lawful source independent of the illegal conduct. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). In such a case, there is no reason to exclude the challenged evidence since the police misconduct is not even a "but for" cause of its discovery. Second, challenged evidence will be admissible under the "attenuation" doctrine, even though it did not have an independent source, if the causal connection between the constitutional violation and the dis-

---

**3.** The State concedes that Detective Haviland's promises of leniency to Hamilton during interrogation rendered Hamilton's subsequent incriminating statements involuntary. Those statements were excluded from evidence by the trial court at both trials in this case. The State likewise concedes that the police violated Hamilton's Sixth Amendment right to counsel when

they elicited incriminating information from Hamilton regarding his actions after the killings. It was at this time that Hamilton accompanied the police and retraced his route from the Pappas residence after the killings and requested his mother to cooperate with the police. *See* Part II, *infra*, at 469–71.

covery of the evidence has become so attenuated as to dissipate the taint. *United States v. Ceccolini*, 435 U.S. at 273–80, 98 S.Ct. at 1058–62. Third, challenged evidence will be admissible under the "inevitable (or ultimate) discovery" doctrine if the prosecution can establish that it inevitably would have been discovered by lawful means without reference to the police misconduct. *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984).

Hamilton argues that Maxine Hamilton's and Paul Lincoln's testimony was not admissible under any of these three exceptions, and urges us to adopt the same reasoning used by the panel majority, which focused primarily on the "attenuation" analysis set forth in *Ceccolini*. We believe, however, that the panel majority read *Ceccolini* too broadly, and, consequently, that it erred in applying attenuation analysis in this case to exclude Maxine Hamilton's and Paul Lincoln's testimony.

In *Ceccolini*, a police officer, while taking a break in the defendant's business shop, noticed an envelope containing money lying on the cash register. Upon closer examination, he found that it also contained slips of paper indicating unlawful gambling activity. He then questioned one of the defendant's employees, who told him that the envelope belonged to the defendant. The officer forwarded this information to an FBI agent, who later interviewed the employee without referring to the incident involving the police officer. The defendant later testified falsely before a federal grand jury that he had never been involved in any way with gambling operations. His employee testified for the prosecution at his subsequent trial for perjury. The defendant sought to suppress his employee's testimony as "fruit of the poisonous tree." The trial court granted the motion, reasoning that the employee-witness "first came directly to the attention of the government as a result of an illegal search." 435 U.S. at 273, 98 S.Ct. at 1058. The court of appeals affirmed, but the Supreme Court reversed. In reversing, the Supreme Court set forth an analytical framework to evaluate the admissibility of live witness testimony under the attenuation doctrine. *Id.* at 274–79, 98 S.Ct. at 1059–61.

■ The *Ceccolini* attenuation analysis does not apply, however, absent an initial factual determination that the identity of the witness whose testimony is challenged was discovered as a result of the constitutional violation. *See id.* at 276 & n. 4, 277, 98 S.Ct. at 1060, & n. 4, 1060. Indeed, the identity of the witness in *Ceccolini* was discovered only because of the unlawful search by the police officer. Attenuation analysis is inappropriate, however, in a case, such as here, in which the police already are aware of the witness's identity and involvement. *See United States v. Crews*, 445 U.S. 463, 471–72, 100 S.Ct. 1244, 1249–50, 63 L.Ed.2d 537 (1980). Moreover, application of the *Ceccolini* analysis beyond its factual context, as was done by the panel majority, would eviscerate the independent source exception to the exclusionary rule.

The independent source doctrine was first recognized by the Supreme Court in *Silverthorne Lumber*. The Court there stated:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used ... but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others....

251 U.S. at 392, 40 S.Ct. at 183. The rationale for the independent source doctrine was explained by the Court in *Nix v. Williams:*

> [T]he derivative evidence analysis ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any

constitutional violation.... The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

467 U.S. at 443, 104 S.Ct. at 2509 (footnote and citations omitted). The critical inquiry under the independent source doctrine is whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct. *Segura v. United States*, 468 U.S. 796, 805, 814, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984); *Nix v. Williams*, 467 U.S. at 459, 104 S.Ct. at 2517 (Brennan, J., dissenting); *see Crews*, 445 U.S. at 471–72, 475, 100 S.Ct. at 1249–50, 1252.

██ In this case that inquiry clearly must be resolved in favor of the State. Before any police misconduct occurred, the police were well aware of Maxine Hamilton's identity and involvement in the case. The Iowa Supreme Court found as follows:

The police interrogation of Hamilton must be divided into two distinct segments, that preceding the suggestion of help and that following it. The interrogation began at police headquarters at approximately 9:20 p.m. on the day following the shooting. Hamilton was properly advised of his *Miranda* rights, and no issue is raised in that regard. The interrogation continued without a problem until approximately 11:00 p.m., when the suggestion of help was made, and the tainting of the confession allegedly occurred. During this pre-tainting segment of the interrogation, Hamilton furnished considerable information. He said he had gone to the victims' house between 3:00 and 3:30 p.m. on the day of the shooting and that Nick Pappas and Cathy Larson were there at that time. He said he purchased some marijuana from Pappas and left for home, where he and his fiancee, Diane Nystrum, stayed until about 8:00 p.m. when they went shopping and to his mother's house before returning home. He stated that just prior to going to bed, Diane had seen a shadow outside the house and that he had gone upstairs to get his shotgun. He said he had sat up all night to protect the home with his shotgun. The officers then asked him if he had any guns besides the shotgun. Hamilton replied that he had a .38 caliber revolver and, when asked where it was, responded that it was "over to his mother's house." (Investigation of the killing had established that a .38 caliber weapon had been used.) Immediately following the defendant's statement about his revolver being at his mother's house, several of the officers left the interrogation room to type up a search warrant application for the mother's house, apparently for the gun and marijuana. It was at this point, when the other officers had left, that Hamilton asked the remaining officer to lock the door and confided to the officer that he "needed help." The officer's response that he would try to help, according to the trial court's suppression order, then tainted the remainder of the statement.

Before the tainting occurred, the identity and possible involvement of Hamilton's mother were known to the officers. The later, tainted, portion of the statement, more clearly focused on the extent of her involvement and contradicted portions of his earlier statement as it pertained to her. For example, in the second half of his statement, he said the gun was not at his mother's house as he originally said but was, in fact, on the bottom of a river. Nevertheless, at the point at which the tainting occurred, the police had already learned about the mother's involvement; their investigation was far from an aimless search for evidence which was dependent for direction upon anything Hamilton said later. The

police knew at that point the mother's house had figured prominently in Hamilton's activities the previous day and had good reason to believe both the marijuana and murder weapon could be found there. 335 N.W.2d at 159. None of these facts is in dispute. In any event, the state court's determinations of factual issues are entitled to the statutory presumption of correctness under 28 U.S.C. § 2254(d).

Though conceding that the police were aware of Maxine Hamilton's identity and potential as a witness before any police misconduct occurred, the panel majority did not accord that fact much weight "given the strength of the evidence of the involuntariness of Maxine Hamilton's testimony." 781 F.2d at 627. The panel majority placed great emphasis on the fact that the State had to subpoena Maxine Hamilton to testify. In the panel's opinion, because her testimony was "coerced" (in the sense that she testified only under subpoena), it was not admissible under the independent source exception. *Id.* at 628 n. 11.

■ The fact that a witness testified only under subpoena does not render the source of that witness's identity or the means by which the witness's testimony was obtained any less lawful. *See Crews*, 445 U.S. at 472, 100 S.Ct. at 1250 ("Here the victim's identity was known long before there was any official misconduct, and her presence in court is thus not traceable to any Fourth Amendment violation."). Though that may be a relevant factor under the *Ceccolini* attenuation analysis, it is not a relevant factor under an independent source analysis. It is one thing to exclude evidence obtained in an unlawful manner; it is quite another to exclude the testimony of a witness whose identity was lawfully discovered. *See Segura*, 468 U.S. at 814, 104 S.Ct. at 3391; *Crews*, 445 U.S. at 471–72, 475, 100 S.Ct. at 1249–50, 1252 ("The exclusionary rule enjoins the Government from benefitting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality."); *cf.*

*United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980). The State has a right to every witness's testimony except in those narrow circumstances where the law recognizes a privilege on grounds of public policy. *Cf. Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972) (noting the "longstanding principle that 'the public ... has a right to every man's evidence' "); *Segura*, 468 U.S. at 816, 104 S.Ct. at 3392 (rejecting the suggestion that there is a "constitutional right" to destroy evidence). Acceptance of the panel's reasoning, however, would create an additional privilege for any witness who, though lawfully discovered and subpoenaed, refuses to cooperate with the police or prosecution, and would superimpose attenuation analysis upon the independent source doctrine.

As the Iowa Supreme Court found, the police were aware of Maxine Hamilton's involvement and her importance as a witness from voluntary statements made by Reed Hamilton during his interrogation on the evening of January 26, 1978. The telephone conversation about which Maxine Hamilton testified occurred the following morning (several hours after interrogation had ceased) when Reed Hamilton was permitted to make a telephone call. The telephone conversation was in no sense part of or tainted by the earlier unlawful police conduct that rendered some of his confession involuntary. The State lawfully had learned of Maxine Hamilton's involvement in the case and it lawfully procured her attendance and testimony at trial with a subpoena. It would be an ironic rule of law to exclude a critical witness's testimony in these circumstances simply because the police had unlawfully obtained some of the same information during the course of their investigation. That would place the State not in the same position it would have been in had no police misconduct occurred, but in a *worse* position, contrary to the Supreme Court's admonition in *Nix v. Williams*. 467 U.S. at 443, 104 S.Ct. at 2509. Reed Hamilton voluntarily provided

the police with information identifying his mother as a witness with valuable knowledge. He cannot now complain that the State took advantage of that information by lawfully subpoenaing his mother to testify at his trial. We hold that Maxine Hamilton's testimony was admissible under the "independent source" exception, and that the state trial court did not err in admitting it.

■ For the same reasons, we hold that Paul Lincoln's testimony was admissible under the independent source exception. At no time during his interrogation did Reed Hamilton mention Lincoln's name. The police lawfully discovered Lincoln (who was living with Maxine Hamilton at the time of the events involved in this case) during the course of their investigation, and they lawfully procured his attendance and testimony at trial with a subpoena. Thus, Lincoln's testimony was admissible under the independent source exception, and the trial court committed no error in admitting it.

The admission of the marijuana itself, however, presents a different situation. It is not seriously disputed that the marijuana was a fruit of unlawful police conduct. The police took Hamilton to his mother's house, after he had been promised leniency, to seek her cooperation in recovering the marijuana. Only then did Maxine Hamilton retrieve the suitcase and give it to the police. The State concedes that the marijuana was not admissible under either the independent source, attenuation, or inevitable discovery exception.

■ At trial the State sought to justify the admission of the marijuana on the ground that the defense had "opened the door" to its admission by cross-examining Maxine Hamilton about her activities in regard to the suitcase of marijuana. The trial judge admitted the marijuana as "rebuttal testimony." The State does not explain in its brief exactly what evidence or testimony it sought to rebut by introducing the marijuana. Nor are we able to discern from the trial transcript a proper reason for its admission as rebuttal evidence.

Therefore, we hold that its admission into evidence was error. *Compare Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925) *and United States v. James,* 555 F.2d 992 (D.C.Cir.1977) *with Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). Our review of the entire trial transcript convinces us, however, that the error was harmless. There was strong circumstantial evidence to permit the jury to conclude beyond a reasonable doubt that Hamilton had robbed Pappas of marijuana. *See* Part III, *infra.* The marijuana itself added little if anything to the State's case. Thus, it was harmless error to admit it into evidence. *See Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).

## II.

Hamilton next contends that improper remarks by the prosecutor in the opening statement and in the closing argument were prejudicial and deprived him of a fair trial.

During closing argument, the prosecutor suggested that there was sufficient circumstantial evidence to convict Hamilton of first degree murder under either a premeditation theory or a felony murder theory. The prosecutor stated, "So on both theories there's ample evidence clearly in this case, evidence of a first degree murder as to both Nick Pappas and Kathy Larson. . . ." Trial Transcript at 547. The defense objected and moved for a mistrial on the ground that it was improper to argue first degree murder as to Pappas since the State had charged Hamilton with only voluntary manslaughter for Pappas's death. For reasons not apparent in the record, Hamilton had been charged with first degree murder only for Larson's death. The trial judge sustained the objection, admonished the prosecutor, and immediately instructed the jury to disregard the prosecutor's remark. The trial judge denied the motion for mistrial. The prosecutor then concluded his closing argument without further incident. Hamilton argues on appeal that the prose-

cutor's improper remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

In a § 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow.[4] The petitioner must show that the alleged improprieties were "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Moore v. Wyrick*, 760 F.2d 884, 886 (8th Cir.1985); *see Darden v. Wainwright*, — U.S. —, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. at 642–43, 94 S.Ct. at 1871; *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial —i.e., that absent the alleged impropriety the verdict probably would have been different. *See Kirkpatrick v. Blackburn*, 777 F.2d 272, 278–79 (5th Cir.1985); *United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279, 1281 n. 1 (7th Cir.1985).

■ Applying that narrow standard of review to the present case, we cannot say that the prosecutor's lone remark, when viewed in the context of the entire trial and not in isolation, *see Donnelly v. DeChristoforo*, 416 U.S. at 643, 94 S.Ct. at 1871, deprived Hamilton of a fair trial. The improper conduct challenged here consisted of a single remark during closing argument. After being admonished by the trial judge, the prosecutor made no other im-

proper remarks. The trial judge gave a cautionary instruction to the jury immediately after the improper remark. Moreover, the evidence of Hamilton's guilt was overwhelming. We hold that Hamilton has not met his burden of showing a reasonable probability that absent the improper remark the jury's verdict would have been different.

Hamilton's objections to the opening statement concern the prosecutor's references to items of evidence and to testimony of witnesses he believed would be introduced during the prosecution's case-in-chief. Our holding in Part I, *supra*, regarding the admissibility of Maxine Hamilton's and Paul Lincoln's testimony disposes in part of Hamilton's contention here. Hamilton also objects to the prosecutor's references to the testimony of Edwin Kracht, a police investigator. Kracht testified to the State's theory of Hamilton's route following the killings and the approximate time and distance between various points along that route. Hamilton contends that Kracht's testimony was based solely on information provided by Hamilton when he retraced his route with the police. The state trial judge previously had excluded any reference to information derived solely from that excursion because it was tainted by police misconduct.

■ A review of the trial transcript convinces us that all the information on which Kracht relied was lawfully obtained from sources independent of the information provided by Hamilton. Evidence from various witnesses (whose identity and testimony were lawfully obtained) provided a reasonably accurate account of Hamilton's actions following the killings. For example, Doug-

4. The standard and burden of proof are different, of course, when we are considering on direct appeal claims of error in a federal criminal trial. On direct appeal, however, we are exercising our supervisory power over matters of judicial administration in the federal district courts. *See, e.g., United States v. Hernandez*, 779 F.2d 456 (8th Cir.1985) (abuse of discretion standard applied to claim of prosecutorial misconduct). Thus, not every trial error that might result in reversal of a federal conviction on direct appeal would mandate the same result in

a § 2254 review of a state court conviction, where we may consider only errors of constitutional magnitude. *See Darden v. Wainwright*, — U.S. —, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) ("[T]he appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 642, 94 S.Ct. at 1871); *Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

las Millin testified that he saw Hamilton at the Pappas residence at approximately 5:30 p.m. on the day of the killings. Martin Grund, a childhood acquaintance of Hamilton's, testified that Hamilton arrived at his house wearing wet clothing at 6:00 p.m. Hamilton told Grund that he accidentally had fallen in the river. Paul Lincoln testified that Hamilton returned to his mother's house at 6:30 p.m. Since Kracht's testimony was based on information lawfully obtained from sources independent of the police misconduct, the prosecutor committed no impropriety in referring to this testimony in his opening statement.

## III.

Hamilton's final contention is that there was insufficient evidence from which a jury reasonably could conclude that he was guilty of first degree murder on a felony murder theory, the predicate felony being a robbery. Hamilton argues that there was no evidence to connect the marijuana he carried into his mother's house with the Pappas residence, and, thus, no evidence that a robbery had occurred.

■ All three reviewing courts that previously have addressed this issue have held that there was sufficient circumstantial evidence to permit the jury reasonably to infer that Hamilton had robbed Pappas of a large quantity of marijuana. *See Hamilton v. Nix*, 781 F.2d at 629 n. 13 (panel opinion); *Hamilton v. Nix*, No. 83–454–B, slip op. at 9–10 (District Court opinion); *State v. Hamilton*, 335 N.W.2d at 161 (Iowa Supreme Court opinion). Our independent review of the entire trial transcript leads us to the same conclusion. There was evidence that both Hamilton and Pappas were drug dealers, and that Hamilton had made an appointment with Pappas to transact a drug deal on the day of the killings. There was evidence that on the day before the killings Pappas had $4600 (an amount sufficient to buy ten pounds of marijuana) and that he usually purchased large quantities of drugs (intended for resale to his customers or to other drug dealers) shortly before the scheduled trans-

action. There was evidence that Hamilton had a .38 caliber gun, that he was at the Pappas residence at the approximate time of the killings, and that Pappas and Larson were shot with a .38 caliber weapon. There was evidence that shortly after the time of the killings Hamilton carried a suitcase containing, according to Paul Lincoln, two bags full of "some kind of tobacco" with a "strange smell" into the house Lincoln shared with Maxine Hamilton, secretly hid it in the basement, and later asked his mother to remove it from the house to conceal it from the police. We are satisfied there was sufficient circumstantial evidence from which the jury could find beyond a reasonable doubt that Hamilton robbed Pappas of marijuana and killed Larson during the course of that robbery. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

The District Court's denial of Hamilton's petition for a writ of habeas corpus is affirmed.

LAY, Chief Judge, with whom HEANEY, McMILLIAN and ARNOLD, Circuit Judges, join, dissenting.

We dissent.

The majority's analysis presents a superficial analysis of the "poisoned fruit" doctrine under *Ceccolini*. It diminishes the attenuated evidence rule to a doctrine of utter ineffectiveness. Under the majority's analysis, if the state becomes aware of the identity of a witness through lawful sources, then whatever information the witness possesses, whether or not it is obtained through coercion or discovered through unlawful sources, becomes evidence proper to use. However, this ignores the Supreme Court's admonition in *Ceccolini*. There, the Court stated that "[t]he fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give." *Ceccolini*,

435 U.S. at 277, 98 S.Ct. at 1060 (quoting *Smith v. United States*, 324 F.2d 879, 881–82 (1963) (Burger, J.)).

Although the majority opinion omits any discussion of the relevant facts, *see ante* at 464, the nature of the constitutional violations that occurred here requires a detailed understanding of the underlying events.

Nick Pappas, Jr., and Cathy Larson were found dead of gunshot wounds in their Des Moines home on the evening of January 25, 1978. There was substantial evidence that Pappas regularly sold large quantities of drugs. Pappas had been shot twice in the back of the head with a .38 caliber revolver; Larson, three times with the same weapon. Their bodies were discovered by Nick Pappas' father and sister sometime between 5:30 and 6:00 p.m.

Shortly after 6:00 p.m., Reed Hamilton appeared at the home of a childhood friend, soaking wet and shaking violently. Hamilton told his friend that he had gone out on the river after an argument with his girlfriend, Diane Nystrom, and had fallen through the ice. The friend gave Hamilton some dry clothes, and, while Hamilton changed, counted out $279.00 Hamilton had with him at Hamilton's request. Hamilton soon left his friend's house, and arrived at his mother Maxine Hamilton's home sometime after 6:30 p.m.

Hamilton entered his mother's house carrying a suitcase. Both Maxine Hamilton and Paul Lincoln, a man with whom Maxine was living at the time, were present when Hamilton arrived. Hamilton took the suitcase down into the basement of the house and came back upstairs empty handed. After Hamilton left to pick Diane Nystrom up from work, Lincoln looked into the suitcase and found two plastic bags inside. Lincoln stated at trial that the bags contained "some kind of tobacco" with a strange smell.

The next day, a postal carrier reported to the police that windows were being broken out of Nystrom and Hamilton's West Des Moines home. A patrolman went to investigate the incident, and found Hamilton sitting in a car in front of the house, dressed only in a bathrobe. Hamilton told the officer that he lived there and that some people had been trying to kill him. Hamilton said that he thought one of them was Nick Pappas' brother. After additional police officers arrived, a search of the house was conducted. No intruders were found, but a bag of marijuana and an empty handgun holster were discovered. Hamilton was then arrested for possession and taken to the West Des Moines police station.

Hamilton was later transferred to the Des Moines police station where, after being advised of his *Miranda* rights, he was questioned about his activities during the previous day. The Iowa Supreme Court determined that Hamilton initially made the following statements to the police:

> [Hamilton] said he had gone to the victims' house between 3:00 and 3:30 p.m. on the day of the shooting and that Nick Pappas and Cathy Larson were there at the time. He said he purchased some marijuana from Pappas and left for home, where he and his fiancee, Diane Nystrum [sic], stayed until about 8:00 p.m. when they went shopping and to his mother's house before returning home. He stated that just prior to going to bed, Diane had seen a shadow outside the house and that he had gone upstairs to get his shotgun. He said he had sat up all night to protect the home with his shotgun. The officers then asked him if he had any guns besides the shotgun. Hamilton replied that he had a .38 caliber revolver and, when asked where it was, responded that it was "over to his mother's house."

*Hamilton*, 335 N.W.2d at 159. After Hamilton made these statements, all but one of the officers present left the interrogation room to prepare an application for a warrant to search Maxine Hamilton's home.

Hamilton then asked the officer who remained in the room to lock the door and confided that he "needed help." In response, the officer replied: "Tell us the truth and we will try to help you." The state judge who held the suppression hear-

ing found this promise of leniency rendered the remainder of Hamilton's statement involuntary and inadmissible.[1] As recounted by the Iowa Supreme Court, following the officer's promise of leniency:

> [Hamilton] stated he had shot the victims and that he had taken approximately ten pounds of marijuana and one ounce of cocaine from the Pappas home; that he took the marijuana to his mother's home where he placed it in a suitcase and hid it in the basement, then he went to "a river" to dispose of the gun and, while walking on the ice, fell in.

*Hamilton,* 335 N.W.2d at 156. Hamilton then agreed to show the police where he had hidden the gun. It was decided, however, to wait until the next morning to act on this plan, because it was too dark to see.

Early the following morning, January 27, at approximately 5:00 a.m., Hamilton called his mother from jail. He asked that she remove the suitcase in the basement from her house. His mother told him that she knew he hadn't killed anyone, to which he replied, "oh yeah, but I did." Paul Lincoln was in the same room with Maxine when she received the call, and heard some of her side of the conversation. According to Lincoln, he and Maxine then went into the living room to talk. It is undisputed that Maxine later took the suitcase to the home of a family friend, Ann Morrison, and asked Morrison to keep it. Less clear is whether Paul Lincoln went with her.[2] The Iowa Supreme Court found, however, that

"Lincoln's testimony also confirmed * * * that he and Maxine * * * took the suitcase to the home of Ann Morrison." *Hamilton,* 335 N.W.2d at 157.

The police arrived at Maxine Hamilton's home at 10:00 a.m. to execute the search warrant, prepared the night before, for locating marijuana and a .38 caliber gun. The search revealed neither the gun nor the marijuana. Maxine Hamilton initially denied that Reed had brought any marijuana into the house. Then one of the officers told her that the police knew Reed had carried ten pounds of marijuana into her house in a suitcase. Shortly thereafter, Maxine admitted, in response to direct questions, that Reed had brought a suitcase into the house and that she had removed it. She did not, however, divulge the location of the suitcase. The testimony is again conflicting, however, regarding what she may have said to the police about Hamilton's early morning telephone call. Maxine Hamilton testified that she lied to the police that morning, and specifically denied telling them anything about the phone call. There was some testimony, however, that she did relate the substance of the call to one officer.[3] In any case, all law enforcement personnel present testified that she was generally uncooperative.

In the meantime, Reed Hamilton had requested the assistance of an attorney who demanded that the police cease questioning Hamilton. Hamilton's attorney also sought and was granted a court order re-

---

1. Both Hamilton and the state sought and obtained state appellate review of this ruling. In April, 1979, the Iowa Court of Appeals upheld the ruling, and the state petitioned for further review of the Iowa Supreme Court. The supreme court denied further review and issued an order to proceed on June 18, 1979. Descriptions of these earlier proceedings are set forth in *State v. Hamilton,* 309 N.W.2d 471, 474 (Iowa 1981) and *State v. Hamilton,* 335 N.W.2d 154, 156 (Iowa 1983).

   The state has not sought to further defend the validity of the officer's conduct. It did not challenge the suppression order on Hamilton's direct appeal or in the course of habeas proceedings. The state's brief to the Iowa Supreme Court in Hamilton's direct appeal in fact characterized the officer's conduct as illegal.

2. The testimony on this point is somewhat confusing. Maxine Hamilton was never asked at trial whether Lincoln accompanied her. Lincoln testified that he went to Morrison's home only in the afternoon, when Maxine did make a second trip there to retrieve the suitcase. Morrison testified that she saw Lincoln only once when Maxine came to recover the suitcase. Lincoln did, however, testify that he went with Maxine to deliver the marijuana, and neither Hamilton's brief on appeal nor his counsel's argument to this court deny Lincoln's involvement in the early morning transfer of the suitcase.

3. The state supreme court made no findings on what Maxine did or did not say to the officers that morning.

straining the police from interrogating Hamilton further. The police subverted this order, however, by persuading Diane Nystrom to act as a conduit for their questions and to convince Reed to retrace the route he took following the killings. The officers told Nystrom that if she could induce Hamilton to cooperate, charges against him would be reduced and he would receive immediate psychiatric help. The officers also said they were afraid children would find the murder weapon if Hamilton did not recover it for them. Nystrom then agreed to do as the police asked. She spoke with Hamilton briefly, and then Nystrom and Hamilton got into a squad car with two police officers. They then travelled the path Hamilton followed the day of the killings, with the officers transmitting questions to Hamilton through Nystrom, and Hamilton in turn answering through her.[4] The officers, Nystrom and Hamilton eventually arrived at Maxine Hamilton's home. Reed Hamilton went to his mother and whispered to her that she should tell the police what she knew, and should retrieve the suitcase because the police were going to help him. Maxine Hamilton and Lincoln later recovered the suitcase and delivered it to the police. They both also gave complete statements, including an account by Maxine Hamilton of her telephone conversation with her son.

As the majority notes, there were two trials in this case.[5] Hamilton's invalidly obtained confession and any direct reference to the trip retracing Hamilton's path were excluded at both trials. Neither Maxine Hamilton nor Paul Lincoln testified at the first trial, although both had been subpoenaed for the limited purpose of identifying and discussing the .38 gun. Both were adjudged in contempt of court. Maxine

Hamilton was sentenced to three months in jail, Paul Lincoln to six months. Ann Morrison also did not testify, and the ten pounds of marijuana were not admitted into evidence.

At the second trial, Lincoln and Maxine Hamilton were both served a subpoena and did testify. Ann Morrison also testified, and the suitcase of marijuana was admitted into evidence. Maxine Hamilton testified that Reed Hamilton had borrowed a hand gun from her sometime before the shootings, and that he had brought the marijuana into her house that evening. She also testified about the early morning telephone call she received from Reed in which he admitted shooting Pappas and had asked her to remove the marijuana from her basement. Paul Lincoln testified that Hamilton had brought the marijuana into the house, confirmed that Maxine had received the call from Reed, and stated that he and Maxine took the suitcase containing the marijuana to Ann Morrison's house. Morrison testified, too, that Maxine had brought the suitcase to her early that morning and that Maxine and Lincoln had retrieved it later in the day.

Defense counsel objected to the admission of Maxine's testimony of Reed's confession to her, all testimony relating to the storage, transfer, and retrieval of the marijuana and the marijuana itself, on the ground that it was inadmissible fruit of Hamilton's illegally obtained confession and the illegal trip. The state trial court overruled these objections, reasoning that the confession to Maxine and the evidence relating to the marijuana "had nothing to do with" the illegal police conduct. The trial court also denied Hamilton's motion for directed verdict of acquittal for felony murder in the death of Cathy Larson and

---

**4.** The state judge ruled on Hamilton's motion to suppress that this procedure was improper and that any evidence received as a result of this activity was illegally obtained. The state again does not claim otherwise in these proceedings, and never appealed the ruling to the state supreme court.

**5.** The first trial resulted in convictions for first degree premeditated murder and voluntary

manslaughter. Hamilton appealed these convictions. The Iowa Supreme Court reversed and remanded for a new trial, finding prejudicial error in the admission of certain statements by Diane Nystrom. *State v. Hamilton,* 309 N.W.2d 471, 476–79 (Iowa 1981). All references to testimony in this dissent relate to testimony taken at the second trial.

overruled his objection to a felony murder instruction. Hamilton's motions for mistrial based on certain statements made by a prosecutor, including references to Hamilton's confession to his mother in opening and closing argument, were likewise denied. The jury convicted Hamilton of first degree felony murder for the death of Cathy Larson and voluntary manslaughter for the death of Nick Pappas.

The Iowa Supreme Court affirmed Hamilton's convictions on appeal. 335 N.W.2d 154 (Iowa 1983). The state court rejected Hamilton's contention that Maxine's testimony regarding his confession to her and the transfer of the marijuana was inadmissible, relying on the "independent source" exception to the exclusionary rule. The court reasoned that since the police were aware of Maxine Hamilton's identity and potential as a witness before any police illegality occurred, the admissibility of her testimony was unaffected by the subsequent acts of misconduct. *Hamilton*, 335 N.W.2d at 158–59. The testimony of Lincoln and Morrison was deemed admissible for the same reason, as their identities and value as witnesses came to light when the police pursued the investigation through Maxine Hamilton. *Id.* at 160. The state court also rejected Hamilton's claim that certain comments made by the prosecutor warranted a mistrial. *Id.* at 160. Finally, the submission of the felony murder charge was held sufficiently supported by the evidence that Hamilton had killed Cathy Larson while perpetrating a robbery. *Id.* at 161.

The federal district court on habeas agreed and dismissed Hamilton's petition. The district court generally concurred in the state court's analysis of the admissibility of the challenged evidence. The district court also rejected Hamilton's argument that the state secured Maxine's cooperation in the investigation only by the illegal conduct, that she testified involuntarily, and that therefore her testimony should have been suppressed. Such an approach, the district court reasoned, would involve the court in the overly speculative task of probing a witness's subjective motivations, and would be contrary to the principle that the state has the right to every person's evidence. The district court also found no constitutional error in the challenged statements by the prosecutor and in the sufficiency of the evidence to support the conviction for felony murder.

On appeal to this court, Hamilton again challenges the admissibility of Maxine Hamilton's testimony of his confession to her, and Maxine, Lincoln, and Morrison's testimony regarding the ten pounds of marijuana. Absent their foundational testimony linking Hamilton to the marijuana itself, he also argues that the marijuana was inadmissible. For the following reasons, we believe that all of this evidence was inadmissible "fruit" of the police misconduct.

It is axiomatic that the exclusionary rule bars the admission of physical evidence and live witness testimony obtained through the exploitation of police illegality, *see e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963), or, to invoke the metaphor, evidence that is "fruit of the poisonous tree." [6]

---

**6.** The Supreme Court has recently limited the scope of the "fruits" doctrine in certain cases premised on alleged violations of the fifth amendment. In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Court held that the fifth amendment does not require the suppression of a confession, made after proper *Miranda* warnings and a valid waiver, solely because the police had obtained an earlier voluntary but unwarned admission from the suspect. 105 S.Ct. at 1298. The Court reasoned that "[w]hen neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evi-

dence of a voluntary confession to be irretrievably lost to the factfinder." *Id.* at 1295.

*Elstad* has no bearing on this case, however. Here, the underlying illegalities involved threatening police tactics resulting in an involuntary confession and interrogation. Moreover, we conclude in this case that Maxine Hamilton and Paul Lincoln's testimony was also involuntary. Thus, since neither the "initial nor subsequent admission[s]" were voluntary with respect to their testimony, the *Elstad* analysis does not obtain.

The admissibility of Ann Morrison's testimony and the physical evidence of the marijuana is

Three exceptions to the exclusionary rule have been recognized, however, permitting the use of such evidence if the prosecution shows that it was or could have been secured "by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 487–88. Evidence may be admitted if it has but an "attenuated link" to the underlying illegality, *United States v. Ceccolini,* 435 U.S. 268, 273–79, 98 S.Ct. 1054, 1058–61, 55 L.Ed.2d 268 (1978); *United States v. White,* 746 F.2d 426, 428 (8th Cir.1984), if it derived from a source independent of the illegal conduct, *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920), or if the evidence would inevitably have been discovered absent the illegality. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 2507–11, 81 L.Ed.2d 377 (1984); *United States v. Apker,* 705 F.2d 293, 306–07 (8th Cir.1983).

The state contends that the challenged evidence was all sufficiently attenuated from Hamilton's illegally obtained statements to permit its admission.[7] In *Ceccolini,* the Supreme Court set forth the analytical framework for evaluating whether live witness testimony falls within the exception. The Court deemed of paramount importance the extent to which "the basic purpose of the exclusionary rule will be advanced by its application" in a particular case. *Ceccolini,* 435 U.S. at 276, 98 S.Ct. at 1060. Relevant to that determination are the costs of permanently disabling a

witness from testifying and the degree of free will exercised by the witness in testifying. *Id.* at 276–78, 98 S.Ct. at 1060–61. Where the cooperation of a witness is in fact the result of an exercise of the individual's free will, unaffected by police misconduct, the purpose of the exclusionary rule would not be served by disallowing the testimony. In determining the strength of the link between the illegality and a witness's testimony, *Ceccolini* directs us to consider the stated willingness of the witness to testify, the role played by the illegally seized evidence in gaining the witness's cooperation, the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial, and the police motivation in engaging in the illegal conduct. *Id.* at 279–80, 98 S.Ct. at 1061–62; *see also United States v. Leonardi,* 623 F.2d 746, 752 (2d Cir.1980).

Applying these factors to the case before us, we conclude that they require the exclusion of Maxine Hamilton's testimony. Throughout the trial court proceedings, she repeatedly expressed her unwillingness to testify. She spent time in jail for contempt during the first trial to avoid giving testimony against her son. There can be no stronger statement of her unwillingness to cooperate than her refusal to do so. She appeared at the second trial again only under subpoena, and after spending three months in jail was well aware of the consequences of future defiance of the order.

---

also unaffected by *Elstad.* This evidence was obtained by Hamilton's illegal interrogation resulting in Maxine's and Lincoln's agreement to disclose the location of the marijuana and deliver it to the police. Not only was the evidence thus involuntarily obtained, but the underlying conduct infringed Hamilton's sixth amendment right to counsel. *Elstad* did not displace the "fruits" doctrine when underlying sixth amendment violations are involved.

7. The state also properly points out that the findings of the state court on factual questions are entitled to a presumption of correctness. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); 28 U.S.C. § 2254(d). We are therefore bound by the state court's finding that the police were aware of Maxine Hamilton's identity and potential as a witness prior to the occurrence of any police misconduct since

that finding is supported by the record. While accepting these facts as true, we are not, however, bound by the state court's holding regarding the ultimate question of the constitutionality of admitting the evidence. Whether the evidence was attenuated, had an independent source, or would inevitably have been discovered are questions of federal law. Cf. *Miller v. Fenton,* — U.S. —, —, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) (voluntariness of confession question of law subject to independent federal determination); *Mata,* 455 U.S. at 597, 102 S.Ct. at 1306 (constitutionality of pretrial identification procedures, not governed by § 2254(d)); *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980) (multiple representation by counsel); *Brewer v. Williams,* 430 U.S. 387, 403, 97 S.Ct. 1232, 1241, 51 L.Ed.2d 424 (1977) (waiver of counsel right).

Testifying under threat of contempt cannot be deemed an expression of willing cooperation. *See United States v. Scios,* 590 F.2d 956, 961 (D.C.Cir.1978) (decision to testify a product of coercion when made under threat of contempt); *United States v. Houltin,* 566 F.2d 1027, 1037 (5th Cir.1978) (Wisdom, J., dissenting) (testimony under threat of contempt obviously coercive); *cf. United States v. Stevens,* 612 F.2d 1226, 1230 (10th Cir.1979) (testimony voluntary when witness testified he cooperated out of a desire to change his lifestyle).

Further, the police misconduct played a crucial role in obtaining Maxine's initial cooperation. Hamilton's compliance with the officers, plainly the result of their misconduct, was used as "leverage" to gain her assistance. *See United States v. Rubalcava-Montoya,* 597 F.2d 140, 143 (9th Cir.1978) (witnesses directly confronted with evidence yielded by illegal search); *cf. United States v. Miller,* 666 F.2d 991, 996 (5th Cir.1982) (no evidence that police used illegally seized evidence in questioning witnesses); *United States v. Brookins,* 614 F.2d 1037, 1043 (5th Cir.1980) (same). Maxine became fully cooperative with the police only when Reed appeared at her doorstep, accompanied by the officers, and requested that she assist in the investigation because the police had offered to help him. The officer's initial promise of leniency, together with the same promises made to Diane Nystrom, plainly motivated Hamilton's plea to his mother that she cooperate fully with the police. The illegal trip in turn created the opportunity for Hamilton to make the request face-to-face to his mother and without the advice of counsel. These circumstances suggest a "close, direct link between the illegal [conduct] and the testimony" ultimately given by Maxine Hamilton. *Rubalacava-Montoya,* 597 F.2d at 143.

It is true that Maxine Hamilton may have divulged some information incriminating Reed when the police were in her home executing the search warrant, before she was aware that Reed had been coerced into cooperating with the police. That she may have done so does not alter our analysis, however. She did tell them that Reed had brought a suitcase into the house and that she had taken it "somewhere." The police report indicates that she gave them this information, however, only after the police told her that they already knew Reed had hidden the suitcase there, information they had obtained during Hamilton's illegal confession. Again, these circumstances suggest a direct exploitation of Reed's confession in securing Maxine's statement. One of the officers also stated that Maxine told him the substance of Reed's 5 a.m. confession to her at that time. Maxine vigorously denied telling the officers this, however. In any event, given the strong showing in this case of the coercion necessary to compel Maxine to testify, such an admission is of minimal significance to the ultimate question of the voluntariness of her testimony.

Our analysis of the proximity of the link between the illegally obtained confession and Maxine Hamilton's willingness to cooperate is also unaffected by the fact that the police were aware of her identity and potential as a witness before any misconduct occurred. The Iowa Supreme Court and the district court below relied on the officers' prior knowledge of her identity and involvement in Reed's activities in holding her testimony admissible.[8] The majority now adopt this rationale. With all due respect, such an analysis is a complete distortion of the principles laid down in *Ceccolini.* Certainly the extent of such independent knowledge may be a factor in evaluating the causal connection between her testimony and the illegal conduct. *See e.g., Leonardi,* 623 F.2d at 752; *United States v. Schaefer,* 691 F.2d 639, 645 (3d Cir.1982); *United States v. Cella,* 568 F.2d 1266, 1286–87 (9th Cir.1977). *That her identity had been discovered, however, does not mean that the substance of her testimo-*

---

**8.** This information was gained by the police in the portion of Hamilton's statement made before the promise of leniency occurred.

ny, and her willingness to give it, had likewise been secured. See Ceccolini, 435 U.S. at 276–80, 98 S.Ct. at 1060–62. Given the strength of the evidence of the involuntariness of Maxine Hamilton's testimony, her prior identification as a potential witness should be given little weight.[9]

Ceccolini also requires consideration of the length of time between the illegal conduct, the decision to cooperate, and the actual testimony at trial in evaluating the voluntariness of a witness's testimony. This consideration goes to the probability that a long span of time between these events afforded the witness a chance for extended reflection indicating that the testimony ultimately given was the product of free choice. See Ceccolini, 435 U.S. at 279, 98 S.Ct. at 1061; United States v. Mergist, 738 F.2d 645, 648 (5th Cir.1984); United States v. Hooton, 662 F.2d 628, 633 (9th Cir.1981). In this case, there was over a three year lapse between the time Maxine Hamilton was wrongfully induced to cooperate and the time of her subpoenaed testimony. One might reason that this long delay supports an inference that considerations unrelated to the police misconduct intervened to dispel her original determination to protect her son. However, there exists nothing in the record to demonstrate any such change in her attitude.

Finally, the last Ceccolini factor, the police motivation in engaging in the improper conduct, also weighs in favor of exclusion. The promises made to induce Hamilton's confession, and the officers' blatant disregard of Hamilton's counsel's request not to question him further appear to have been directed in large part at discovering

such valuable testimony. In such circumstances, Ceccolini suggests that even willing testimony may be inadmissible. See Ceccolini, 435 U.S. at 276 n. 4, 98 S.Ct. at 1060 n. 4 (voluntariness may be differently weighed when illegal conduct is engaged in for the specific purpose of discovering potential witnesses). Moreover, the Supreme Court has recently noted that an assessment of the flagrancy of police misconduct is an important step in evaluating the deterrent effect of exclusion. United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 3415, 82 L.Ed.2d 677 (1984). It could not have escaped the officers that Hamilton would convey the same enthusiasm for cooperation to his mother when they met during the illegal excursion that he himself showed as a result of their promises of leniency. We would hold, therefore, for all of the above reasons, that the ultimate purposes of the exclusionary rule would be served by exclusion of Maxine Hamilton's unwilling testimony.[10]

We next turn to the issue of the admissibility of Paul Lincoln's testimony. His testimony established that Reed had brought a large quantity of marijuana into the house, that Maxine had received a phone call from Reed in the middle of the night, and that he and Maxine had delivered the marijuana to Ann Morrison. The Iowa Supreme Court concluded that Paul Lincoln's testimony was admissible, since his identity and potential value as a witness were discovered through Maxine Hamilton, not the police misconduct. We do not dispute that the police legally discovered his identity,

9. We thus cannot agree with the district court's view that the degree of free will exercised by Maxine Hamilton in testifying must be deemed irrelevant. The district court considered such an inquiry an invitation to inappropriate speculation into subjective states of mind. However, it seems clear that the factors set forth in Ceccolini for evaluating the admissibility of her testimony require such an inquiry. Further, we also do not agree that evaluating motivation would "run counter to the ancient principle of law that the public has a right to every person's evidence," as the district court believed. We consider of greater relevance the proposition

that the state does not have the right to exploit evidence gained in violation of an accused's constitutional guarantees.

10. For the same reasons, we would reject the state's contentions that her testimony was admissible under the independent source or inevitable discovery exceptions to the exclusionary rule. Our conclusions that her cooperation was inextricably linked with the underlying misconduct and that her ultimate testimony was coerced preclude the application of these exceptions to her own testimony.

but we again find difficulty in the admission of his testimony under *Ceccolini*.

On the surface, the circumstances surrounding Paul Lincoln's testimony suggest more persuasive reasons for admitting his testimony than Maxine Hamilton's testimony. There is, in Lincoln's case, "evidence that [he] was completely uncooperative when originally discovered * * * but later changed his attitude and supplied the necessary information." *United States v. Parker*, 722 F.2d 179, 185 (5th Cir.1983) (quoting *United States v. Marder*, 474 F.2d 1192, 1196 (5th Cir.1973)). He did state at trial that he was testifying willingly, and that he would have testified at the first trial except that his lawyer "asked him not to."

A witness's stated willingness to testify, however, is just one of the factors to be considered under *Ceccolini*. In all other respects, Paul Lincoln's testimony was derived and was given under circumstances identical to the circumstances surrounding Maxine Hamilton's testimony. Like Maxine Hamilton, he testified only under subpoena at the second trial after having spent time in jail for contempt for refusing to testify at the first trial. Lincoln did state at the second trial that he would have told the police officers anything they wanted to know during the initial investigation. However, the record discloses that the police did question Lincoln when they executed the search warrant and that he was even less cooperative than was Maxine Hamilton at that time. Lincoln accompanied Maxine to retrieve the marijuana and gave his statement to the police only after Hamilton, at Nystrom's request, sought his mother's cooperation. Thus, the nexus between the illegal conduct and Lincoln's cooperation is at least as compelling in his case as it is in Maxine Hamilton's.

Further, the conduct of the police in seeking evidence about the marijuana was particularly flagrant. During the execution of the search warrant, one of the officers specifically said they knew about the marijuana in order to induce Maxine Hamilton and Lincoln to speak. This information came directly from Reed Hamilton's confession and was no doubt the kind of evidence the police were motivated to uncover in making the promises to Hamilton in the first place. Under these circumstances, where the police misconduct arose from a desire to find just the sort of evidence ultimately adduced through Lincoln's testimony, the significance of the witness's stated willingness to testify is further diminished. *See Ceccolini*, 435 U.S. at 276 n. 4, 98 S.Ct. at 1060 n. 4. We therefore would hold that Paul Lincoln's testimony was also inadmissible fruit of the unconstitutional police conduct.[11]

Finally, the state presents no evidence suggesting that, absent the testimony of Maxine Hamilton or Paul Lincoln, Ann Morrison would have been identified or come forward as a witness. Nor is there any evidence that the police would have or could have located the marijuana and uncovered sufficient foundational evidence linking it to Hamilton and the scene of the crime to permit its admission at trial. In sum, we would hold that all of the challenged testimony and physical evidence should have been excluded and was improperly admitted.

Moreover, given that this unconstitutionally obtained evidence was improperly admitted, its use at trial was not harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *Anderson v. Nelson*, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968); *Stump v. Bennett*, 398 F.2d 111, 121 (8th Cir.1968). The state produced considerable evidence tending to show that Hamilton was at the Pappas residence near the time of the shootings and that Pappas was Hamilton's drug supplier. It was also undisputed at trial that Hamilton had used substantial amounts of cocaine the day of and day after Pappas and Larson were killed, and that he had a gun similar to the one used to kill them.

---

**11.** The state does not argue, nor could we conclude, that Lincoln's testimony had an independent source or would have inevitably been discovered.

However, the state placed considerable reliance on Hamilton's early morning confession to his mother in establishing that Lincoln had killed Pappas and Larson. The prosecutor, in fact, near the end of his closing argument reminded the jury that the "one person you don't lie to is your mother."

Contrary to the ruling of the majority, the suitcase of marijuana was crucial to the state's theory of motive. The prosecutor plainly sought to convince the jury that Hamilton had killed Pappas to get the drugs. Finally, the marijuana played a pivotal role in the state's proof that a robbery had occurred, the underlying felony supporting the felony murder conviction for the death of Cathy Larson. Given the key role the challenged testimony and physical evidence played in the prosecution's case, we would hold that the constitutional error in admitting this evidence was not harmless beyond a reasonable doubt.

For these reasons, we would vacate the conviction and remand the cause to the district court to grant the writ unless a new trial for the petitioner was provided within a reasonable period of time.