**STATE of Minnesota, Petitioner, Appellant,**

v.

**John William DOUGHTY, Respondent.**

No. C7–89–1934.

Supreme Court of Minnesota.

July 12, 1991.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Thomas Foley, Ramsey County Atty., Mark Nathan Lystig, Asst. Ramsey County Atty., St. Paul, for appellant.

William E. Falvey, Ramsey County Public Defender, Richard J. Coleman, Asst. Ramsey County Public Defender, St. Paul, for respondent.

KEITH, Chief Justice.

This case arises upon the state's appeal of a pretrial order denying a motion for reconsideration and affirming the trial court's previous order suppressing all evidence in the prosecution of defendant John William Doughty for first degree burglary and second degree assault. The court of appeals, with Judge Short dissenting, affirmed the trial court's ruling that police violated defendant's rights under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *State v. Robinson,* 427 N.W.2d 217 (Minn.1988), requiring the suppression of all of the state's evidence in this case, including the testimony of the alleged victim and other live witnesses. *State v. Doughty,* 456 N.W.2d 445 (Minn. App.1990). Concluding that the trial court erred in not applying the factors announced in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), to determine the admissibility of live witness testimony, we reverse the decision of the court of appeals and remand to the trial court for further proceedings.

I

The state has evidence indicating that defendant came to Minnesota from Florida in 1988 and obtained a job as a cook at Lee's Kitchen in Highland Park in September. Two young women, one of them 16–year–old S., worked with defendant at Lee's Kitchen. Defendant called S. one night and also called T., the other young woman. S. and T. reported the calls to Oliver Weir, kitchen manager at the restaurant, who previously had noted that defendant acted strangely. As a result Weir terminated defendant on October 4, 1988.

According to police reports introduced at the *Rasmussen* hearing, during the early morning hours on October 17, 1988, an intruder, armed with a fixed-blade knife, entered S.'s family house by removing a window screen and awakened S. She immediately recognized the man as defendant, whom she knew only as "John" from the restaurant. Defendant, who claimed that he did not know whose house he had entered, used some rope to bind S., gagged her, and tore her sweatpants. Several hours later, after securing her promise not to report him, a promise secured by a threat to kill her, defendant untied her and left.

The police reports indicate that S. told her mother about the incident later that day. The father called a friend, Assistant Ramsey County Attorney David Dietz, and told him some of the facts but said they did not want to press charges because they were afraid defendant might deliver on his promise to seek revenge. The assistant county attorney in turn contacted Sergeant John De Noma of the St. Paul Police Department and passed along some of the information but did not give the name of the alleged victim or the name of the reporter of the information. De Noma checked to see if any similar incidents had been reported. He knew only that a Highland Park restaurant employee named John was involved. Upon investigation, he learned that two Johns had worked at Lee's Highland Village Inn and Lee's Highland Kitchen—one being defendant, whose listed address was given. Unable to find any arrest warrants for either man, De Noma ended his investigation but not without writing up a supplementary report. Because there was no formal complaint, De Noma did not give the report a complaint number but apparently kept the report for possible future reference, a practice not uncommon in the department.

One month later, on November 13, 1988, defendant committed a hideous crime in Hennepin County. Specifically, defendant kidnapped an 18–year–old church youth volunteer worker after striking her on the head and pushing her into the trunk of his automobile. He drove to Minnehaha Park where he tied the woman to a tree, gagged her, told her he was going to sacrifice her to Satan, and attempted to cut off her feet. The victim lost and regained consciousness during the 9½-hour attack. Eventually, promising not to identify him, the victim persuaded defendant to take her to a hospital, where she was treated for severe blood loss and hypothermia. This offense and the subsequent arrest and filing of charges against defendant received substantial attention in the local media.[1]

St. Louis Park police arrested defendant in connection with the Hennepin County offense on November 14, and Investigator Glen Hunter, after giving defendant a *Miranda* warning, commenced a custodial interrogation. Defendant at first denied committing the offense but then, a few minutes into the interrogation, he said, "I did it for Satan." Then defendant asked, "Shouldn't I have an attorney so you don't ask me any illegal questions?" Investigator Hunter made no response. After a pause, defendant said, "What do you think?" Hunter replied, "I'm very interested in hearing your side of the story." Defendant then went on to give a detailed confession to the Hennepin County offense. Later during the interrogation defendant mentioned having committed a crime on a specific avenue in Highland Park in St. Paul, saying that the devil had directed him to enter a house occupied by a young woman, tie her up, cut off her legs, and eat her flesh. He found he could not complete the intended crime and fled after begging her not to call the police. Defendant later gave

---

**1.** Contrary to the dissent's objection, we do not include the facts of the St. Louis Park offense to demonstrate that defendant is an evil person. Whether defendant is an evil person of course is irrelevant to the determination of the legal issues in this case. The facts surrounding defendant's commission of the St. Louis Park offense, however, are relevant. First, a brief description of the St. Louis Park offense is necessary as background to explain defendant's custodial interrogation. Second, the details of the St. Louis Park offense explain the extensive media coverage devoted to this high profile crime—information relevant to whether S. would have reported the crime on her own.

further details of the offense as he rode with an officer to St. Paul and showed the officer the house in question.

On November 16 Sergeant Gregory Pye of the St. Paul Police Department contacted S.'s family and asked them to get back to him. S.'s mother met with him on November 17 and revealed many of the details of the offense. Also on November 17, Pye talked with Weir, the kitchen manager at the restaurant, who on his own had called the St. Paul police after reading about defendant in a newspaper report of the Hennepin County kidnapping and assault. Weir told Pye about defendant's telephone harassment of S. and T., whose names he gave to Pye. Pye also talked with S., who reported details of the assault and identified defendant's picture from an obviously fair photographic display. She gave Pye physical evidence of the assault, including pieces of rope and some of the clothes she was wearing during the assault. S. also revealed she had received a call from defendant's girlfriend, who had found pictures in her house with S.'s family name and phone number on them, pictures that had to have been taken from S.'s house by defendant. Pye also became aware of Sergeant De Noma's report.

Defendant subsequently was charged in Hennepin County with attempted murder in the first degree, assault in the first degree, and kidnapping involving great bodily harm. He pled guilty to the kidnapping charge and received a 30–year prison sentence. *See State v. Doughty,* CX–90–671, 1990 WL 105989 (Minn.App. July 3, 1990).

The instant prosecution was commenced in Ramsey County, where defendant was charged with two counts of burglary in the first degree and one count of assault with a dangerous weapon. At the *Rasmussen* hearing the trial court said that in its opinion Investigator Hunter violated the *Edwards* rule and that the only real issue was whether some or all of the evidence still could be admitted on the theory that it was not the fruit of the poisonous tree. The

trial court apparently saw the fruit-of-the-poisonous-tree issue as primarily an issue involving the inevitable discovery exception to the exclusionary rule and ruled that none of the evidence would have been inevitably discovered in the absence of defendant's statements obtained in violation of *Edwards.*

The state, taking issue with the trial court's focus, filed a timely motion for reconsideration,[2] arguing that even if the trial court was correct about the *Edwards* issue, at a maximum only some of the evidence, not all of it, should be suppressed. In support of this motion the state relied in part on *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), discussed *infra.* The state also submitted an affidavit stating that S.'s mother told the prosecuting attorney that she probably would have contacted the Ramsey County Attorney and the St. Paul Police Department after learning about defendant's arrest and incarceration in the newspapers. The trial court denied the motion summarily and the state's pretrial appeal followed.

The court of appeals ruled that there was an *Edwards* violation, that the derivative evidence rule applies to such a violation, and that all of the evidence was the suppressible fruit of the poisonous tree. *State v. Doughty,* 456 N.W.2d 445 (Minn.App. 1990). The dissent argued that even if the trial court was correct in suppressing defendant's statements, the trial court erred in suppressing all of the other evidence.

## II

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court determined that the fifth and fourteenth amendments' prohibition against compelled self-incrimination requires that an accused have the right to have counsel present during custodial interrogation. *Edwards v. Arizona,* 451 U.S. 477, 481–82, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). To protect this right,

---

**2.** The trial court has discretion to reopen the *Rasmussen* hearing and reconsider or clarify a prior ruling based on a party's timely motion.

*State v. Montjoy,* 366 N.W.2d 103, 107 (Minn. 1985); *State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977).

the Court required that police advise the accused of the right to remain silent and the right to assistance of counsel during custodial interrogation. *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630. If the accused invokes the right by requesting counsel, "the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628. In *Edwards,* the Court held that an accused, who has expressed the "desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available" unless the accused initiates further communication with the police. 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

Here, instead of making a clear and unequivocal request for counsel, defendant asked, "Shouldn't I have an attorney so you don't ask me any illegal questions?" Although the Supreme Court has recognized that an accused may make an ambiguous or equivocal request for counsel, it has not decided what standards govern whether equivocal statements constitute invocation of the *Miranda* right to counsel. *See Smith v. Illinois,* 469 U.S. 91, 95–96, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984); *Connecticut v. Barrett,* 479 U.S. 523, 529–30 n. 3, 107 S.Ct. 828, 831–32 n. 3, 93 L.Ed.2d 920 (1987). In this vacuum, we have held that "when a suspect indicates by an equivocal or ambiguous statement, which is subject to a construction that the accused is requesting counsel, all further questioning must stop except that narrow questions designed to 'clarify' the accused's true desires respecting counsel may continue." *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988).

■ Although defendant's question, "Shouldn't I have an attorney so you don't ask me any illegal questions?" is not a clear and unequivocal request for counsel, it certainly is subject to the construction that defendant desired to deal with police only through counsel. Under *Robinson,* Officer Hunter then was required either to halt the interrogation or to clarify with narrow questions defendant's desire with respect to counsel. Instead, after a period of silence and then defendant's second question "What do you think?" Hunter continued the interrogation by stating, "I'm very interested in hearing your side of the story." We agree with the trial court that Hunter violated defendant's rights under *Edwards* and *Robinson.* Thus, the trial court properly suppressed defendant's subsequent statements to the police. *State v. Warndahl,* 436 N.W.2d 770, 775 (Minn. 1989).

### III

We now must determine whether the trial court correctly applied the derivative evidence rule to exclude all of the other evidence in this case including testimony of the alleged victim and other live witnesses. *See State v. Warndahl,* 436 N.W.2d 770, 775–76 (Minn.1989) (applying traditional fruit-of-the-poisonous tree analysis to an *Edwards* violation). The trial court, applying the inevitable discovery doctrine from *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), determined that the state had not demonstrated by a preponderance of the evidence that evidence of the Highland Park offense would have been inevitably discovered. *See id.* at 444, 104 S.Ct. at 2509. The trial court treated live witness testimony—even the testimony of the alleged victim—the same as any other inanimate derivative evidence, and suppressed all of the state's evidence.

The trial court, incorporating the defendant's memorandum into its own memorandum, adopted the defendant's view of the facts to determine that the state had not proven inevitable discovery:

> The Court agrees with the argument set forth by defense counsel in defendant's memorandum:
>
> > Assuming that on November 17, 1988, there was no ongoing investigation by St. Paul authorities of a crime in Highland Park for which Mr. Doughty was a suspect, the independent information provided by Mr. Weir could have led to a number of different results:
> >
> > 1. The information could have been 'retained' by Sergeant Pye much in the same way that Sergeant De Noma 're-

tained' the information he received from Mr. Dietz in October.

2. Sergeant Pye might have referred Mr. Weir [t]o St. Louis Park authorities because they were the jurisdiction conducting the investigation of Mr. Doughty.

3. Sergeant Pye might have followed up on the information and contacted the two waitresses. In fact, Sergeant Pye never contacted [T.] and still had not done so on February 14, 1989. Perhaps Sergeant Pye might have contacted [S.], but given the fact that [S.] never reported the crime in the first place, it would be sheer speculation whether she would have reported it after having been contacted on November 17, 1988 by Sergeant Pye. Over 30 days had elapsed and [S.] never had reported the crime.

Due to the extensive publicity surrounding the Hennepin County crime, [S.] might have been aware that defendant had been arrested on November 14, 1988, in St. Louis Park. If she were, the fact is she still had not contacted any law enforcement agencies in either jurisdiction regarding the burglary of her Highland Park home on November 17, 1988.

By adopting the defendant's characterization of the facts, the court rejected testimony from Sergeant Pye about how he would have handled the information obtained from Weir. Sergeant Pye testified that, if he had not received any information from the St. Louis Police Department about the Highland Park offense, he would have contacted both S. and T. When asked why he, in fact, had not contacted T., he answered: "First of all, you get into this thing—and this was overwhelming—and there was just no relationship between her and this offense." Pye's testimony suggests that he did not contact T. because he already, in fact, did have information from the St. Louis Park Police Department linking defendant to the Highland Park offense. Faced with an "overwhelming" investigation involving S. and without any further information that defendant had committed any crime against T., Pye appar-

ently chose to concentrate on S. The trial court, in its proper role of determining the credibility of witnesses, chose to disbelieve Sergeant Pye.

The trial court also determined that because S. did not report the offense by November 17, four days after the Hennepin County offense, the publicity surrounding that offense would not have caused her to report the crime. The state submitted articles detailing defendant's involvement in the Hennepin County offense that appeared prominently in both local newspapers on November 17 and 18. Defendant was not charged with the Hennepin County offense until November 16; the papers reported his arraignment on November 17. The November 18 articles reported in greater detail the Hennepin County offense and defendant's personal history. The trial court accepted the defendant's assertion that because the victim did not call the police in the morning on the day the newspapers reported that defendant was charged with the Hennepin County offense, we can assume that the publicity would not have motivated S. to report the crime. We think it unreasonable for the court to expect S. to come forward before it was even public that defendant was in custody and charged with the Hennepin County offense. Although the trial court received the newspaper articles for the limited purpose of establishing the notoriety of the Hennepin County offense, it is interesting to note that a November 19 newspaper article, also in the record, reported that news reports of defendant's involvement in the Hennepin County offense prompted another woman to notify police of a previously unreported assault allegedly committed by defendant in September. Apparently because of confusion whether non-police witnesses ought to be called at a pretrial suppression hearing, the state did not call S. or members of her family who perhaps could have added further support to the state's position.

Despite our concern over some of the court's inferences, based on the evidence submitted during the *Rasmussen* hearing, as a reviewing court we do not find the trial court's findings of fact clearly errone-

ous. Therefore, we do not disturb its determination that the state had failed to demonstrate by a preponderance of the evidence that its evidence would have been inevitably discovered. We hold, however, that the trial court erred in its application of the law.

■ Application of traditional fruit of the poisonous tree analysis[3] very well may require admission of some, if not all, of the other evidence suppressed by the trial court. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962). In *Wong Sun,* the Court rejected a "but for" test: evidence is not " 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Id.* at 487–88, 83 S.Ct. at 417. Instead, the court must ask "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. at 417–18 (quotation omitted). Applying the *Wong Sun* derivative evidence rule, the court in this case failed to consider the distinction recognized by the United States Supreme Court between suppressing an inanimate object derived from police misconduct and suppressing the voluntary testimony of a living witness whose name was secured through police misconduct. *See United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

Before the United States Supreme Court clarified the law in this regard, the rule in Minnesota provided that even though a defendant's statements were suppressible as the result of the defendant's illegal arrest, the eyewitnesses discovered as a result of the defendant's statements were not the suppressible fruit of the poisonous tree. *See, e.g., State v. King,* 286 Minn. 392, 397–98, 176 N.W.2d 279, 283 (1970). The United States Supreme Court subsequently rejected this per se rule in *United States v. Ceccolini,* 435 U.S. 268, 274–75, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978). The *Ceccolini* Court, however, emphasized that "the exclusionary rule should be invoked with *much greater reluctance* where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness [to the crime] than when a similar claim is advanced to support suppression of an inanimate object." *Id.* at 280, 98 S.Ct. at 1062 (emphasis added). The Court set forth a number of factors to be considered when applying the exclusionary rule to live witness testimony.

One key factor is the degree of free will exercised by the witness. *Id.* at 276, 98 S.Ct. at 1060. As the Court put it:

Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

The proffer of a living witness is not to be mechanically equated with the prof-

---

**3.** The state's arguments at the *Rasmussen* hearing and in its brief focused on the inevitable discovery doctrine perhaps because of the trial court's statement that counsel direct their arguments at the *Rasmussen* hearing to whether the evidence was inevitably discovered. The trial court, however, still had to determine whether the evidence was fruit of the poisonous tree or whether the connection between the illegality and the evidence had "become so attenuated as to dissipate the taint," *Nardone v. United States,*

308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939). Recognizing that he must rely on the derivative evidence rule to suppress the evidence, defendant cited in his *Rasmussen* memorandum *Nardone* and *Wong Sun*—traditional fruit of the poisonous tree cases. Moreover, the state's memorandum in support of its motion for reconsideration relied in part on *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

fer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.

*Smith v. United States*, 117 U.S.App. D.C. 1, 3–4, 324 F.2d 879, 881–82 (1963) (Burger, J.) (footnotes omitted), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964).

*Id.* 435 U.S. at 276–77, 98 S.Ct. at 1060.

Another key factor is that the exclusion "would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the [original illegal activity by the police]." *Id.* at 277, 98 S.Ct. at 1060. With respect to this factor the Court said:

Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, "serious obstructions to the ascertainment of truth"; accordingly, "[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions." C. McCormick, Law of Evidence § 71 (1954). Alluding to the enormous cost engendered by such a permanent disability in an analogous context, we have specifically refused to hold that "making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *United States v. Bayer*, 331 U.S. 532, 541 [67 S.Ct. 1394, 1398, 91 L.Ed. 1654] (1947). For many of these same reasons, the Court has also held admissible at trial testimony of a witness whose identity was disclosed by the defendant's statement given after inadequate *Miranda* warnings. *Michigan v. Tucker*, 417 U.S. 433, 450–451 [94 S.Ct. 2357, 2367, 41 L.Ed.2d 182] (1974).

For, when balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce. * * * Here respondent's own statement, which might have helped the prosecution show respondent's guilty conscience at trial, had already been excised from the prosecution's case * * *. To extend the excision further under the circumstances of this case and exclude relevant testimony of a third-party witness would require far more persuasive arguments than those advanced by respondent.

In short, since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required.

*Id.* at 277–278, 98 S.Ct. at 1060–61.

Other factors enumerated by the Court include whether the illegally obtained evidence or information was used in questioning the witness; the amount of time that has elapsed between the time of the illegal activity and the initial contact with the witness, on the one hand, and between the latter and the witness' testimony at trial on the other; and whether the evidence indicates that the purpose of the illegality was to find witnesses to testify against the defendant with respect to the crime to which the testimony of the witness relates. *Id.* at 279–80, 98 S.Ct. at 1062.

In *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the Court held that *at trial identification* of the defendant *by the victim* was not a suppressible fruit of the defendant's earlier arrest which led to a suppressed out-of-court identification. With respect to the victim's cooperation, the Court said:

Nor did the illegal arrest infect the victim's ability to give accurate identification testimony. Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this

mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber. No part of this process was affected by respondent's illegal arrest. In the language of the "time-worn metaphor" of the poisonous tree * * * the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned.

445 U.S. at 472, 100 S.Ct. at 1250 (footnote omitted). *See also State v. Seefeldt,* 292 N.W.2d 558, 560 (Minn.1980) (relying on *Ceccolini* and *Crews* to uphold the admission of identification testimony claimed by the defendant to be the suppressible fruit of an unlawful arrest).

Under the principles announced in *Ceccolini* and *Crews,* we believe that it would be an extremely rare case in which a victim would be precluded from testifying because his or her name was discovered at the end of a chain of events linked to police misconduct. The primary purpose of excluding evidence derived from a violation of a criminal defendant's constitutional rights is to deter police misconduct. *State v. Conaway,* 319 N.W.2d 35, 41 (Minn.1982). The courts must not lose sight of the rule's deterrent purpose and mechanically apply the rule to exclude all inanimate objects and testimony of witnesses discovered as the result of a series of events linked at the beginning to police misconduct. As Justice Clark wrote in *Mapp v. Ohio,* "[t]here is no war between the Constitution and common sense." 367 U.S. 643, 657, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961). Treating the victim of a crime the same as a piece of cloth, a bloodied knife, or a canceled check, ignores the individual's emotions, volition, and intellect; it dehumanizes the victim, and it belies common sense. The Supreme Court's requirement in *Ceccolini* that trial courts consider a living witness' free will and volition and the consequences of perpetually disabling the witness reconciles the Constitution with common sense.

Under *Ceccolini,* the question is not whether the victim or the witness inevitably would have reported the crime. Instead, the court must ask whether the victim or witness is testifying of her own free will rather than at the compulsion of the state resulting from the discovery of her name through illegal means. This case does not involve a coconspirator whose own criminal behavior prevented her from coming forward earlier or a witness compelled to testify with the threat of contempt proceedings. *See, e.g., United States v. Leonardi,* 623 F.2d 746, 751–52 (2d Cir.) (admitting testimony as part of a plea agreement by government witness whose testimony was motivated in part by incriminating evidence discovered during illegal search), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980); *United States v. Brookins,* 614 F.2d 1037, 1043 (5th Cir.1980) (stating that the witness' "testimony was 'in no way coerced' in the *Ceccolini* sense, although it was partially induced by a grant of immunity"); *United States v. Stevens,* 612 F.2d 1226, 1229 (10th Cir.1979) (stating that witness' testifying as part of a plea bargain "does not diminish the volition of coming forward"), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). *Compare United States v. Scios,* 590 F.2d 956, 961 (D.C.Cir. 1978) (holding that witness' decision to testify, made solely to avoid being jailed for contempt, is not a matter of free will).

The not unjustifiable fear of retaliation appears to have prompted the initial decision not to report the intrusion. To require S. and her parents to overcome their fear and to report the occurrence within a few days after defendant's arrest in connection with another crime would be to assume too much. Here, the newspapers did not even report that defendant had been charged with the Hennepin County offense until November 17, the day the St. Paul Police contacted her family. The young woman's fear of retaliation was a powerful deterrent to her reporting the crime. To silence forever the victim of a crime because the perpetrator secured her initial silence with threats would reward the perpetrator for his intimidation. *Cf. State v. Black,* 291 N.W.2d 208, 214 (Minn.1980) (holding that defendant, who intimidated a witness into silence, forfeited his right to confront the witness at trial).

Of the other *Ceccolini* factors, the purpose of the illegality has particular bearing on this case. In *Commonwealth v. Lahti,* 398 Mass. 829, 501 N.E.2d 511 (Mass.1986), the only reported appellate case we located that was decided after *Ceccolini* and that suppressed the testimony of a victim under the derivative evidence rule, the court based its decision on the lower court's findings "that the police obtained the defendant's involuntary statement for the very purpose of obtaining information, previously unknown to them, of other crimes committed by the defendant and the identity of victims whose testimony might be used as proof, and that the effort of the police was successful." *Id.* at 832, 501 N.E.2d at 513.

In this case the purpose of the illegality was not to obtain evidence of other crimes committed by defendant or the identities of other victims.[4] Investigator Hunter answered defendant's question if he should have an attorney with "I'm very interested in hearing your side of the story." Hunter was inviting defendant to discuss the Hennepin County offense; he was not seeking evidence of other crimes. Later in the interrogation, defendant brought up the Highland Park offense on his own without prompting from Hunter. In eliciting further statements from defendant, Hunter had no intention of discovering the identity of a victim of or witnesses to a distinct crime committed by defendant. *See United States v. Hooton,* 662 F.2d 628, 633 (9th Cir.1981) (admitting live witness testimony where purpose of illegal search was not to obtain evidence of federal firearms offenses, the charged crimes, but rather to obtain stolen firearms and evidence of who controlled the area searched).

We conclude that the trial court erred by failing to consider the factors announced in *United States v. Ceccolini* for the suppression of live witness testimony.[5] We believe it is apparent that S. and her parents, though initially reluctant to report the crime because of defendant's threats, have voluntarily decided to cooperate with the police and testify in accordance with their own free will now that defendant cannot deliver on his threats. Nevertheless, because we reverse and remand, we deem it proper that the trial court reopen the *Rasmussen* hearing to allow the state to present testimony of S., members of S.'s family, Weir, defendant's girlfriend, and any other live witnesses and determine whether the live witness testimony, as well as physical evidence presented to police by these witnesses, is tainted under traditional fruit-of-the-poisonous-tree analysis. Of course, the trial court is also free to reconsider its ruling that none of the evidence would have been inevitably discovered.

Reversed and remanded for proceedings consistent with this opinion.

GARDEBRING, J., took no part in the consideration or decision of this case.

TOMLJANOVICH, Justice (dissenting).

I agree with the majority's conclusion that the police officials interrogating respondent while in custody violated his fifth amendment right to counsel. I do not agree that the trial court erred in suppressing all of the evidence the state derived from that constitutional violation.

---

4. Another crucial fact distinguishes this case from *Lahti.* We have no evidence that defendant's statement was involuntary in this case. An *Edwards* violation does not render any statement made during the subsequent interrogation involuntary. The Supreme Court recently reiterated that *Edwards* is a prophylactic rule that "ensures that any statement made in subsequent interrogation is not the result of coercive pressures. *Edwards* conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness." *Minnick v. Mississippi,* — U.S. —, —, 111 S.Ct. 486, 489, 112 L.Ed.2d 489 (1990). Thus *Edwards* requires the suppression of the confession "even though the confession might be vol-

untary under traditional Fifth Amendment analysis." *Id.* at —, 111 S.Ct. at 490 (quoting *Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979)).

5. Instead of "manufactur[ing] a rule permitting the introduction of [live witness] testimony irrespective of what tactics were employed to secure it," as the dissent charges, we merely require that the trial court apply a settled rule established by the United States Supreme Court that, in fact, does consider the police tactics involved as well as *the purpose of the police conduct.*

## I

The United States Supreme Court has not directly resolved whether the derivative evidence rule articulated in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)[1], applies to evidence derived solely from statements elicited in violation of the right to counsel protected by the fifth amendment. *See Patterson v. United States*, 485 U.S. 922, 923, 108 S.Ct. 1093, 1094, 99 L.Ed.2d 255 (1988) (White, J., dissenting from denial of cert.); *but cf. Nix v. Williams*, 467 U.S. 431, 442, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984) (*Wong Sun* derivative evidence rule applies to evidence obtained in violation of the fifth amendment); *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980) (derivative evidence rule applies to any "fruit" of a constitutional violation).

This court, however, has itself concluded that where police initiate custodial interrogation after an accused requests the presence of an attorney, evidence derived from the accused's subsequent statements may be inadmissible. *See State v. Warndahl*, 436 N.W.2d 770 (Minn.1989). Whether the derivative evidence remains admissible or must be suppressed turns on the purpose and flagrancy of the police misconduct, the presence of intervening circumstances, whether the evidence would likely have been discovered absent the police misconduct, and the temporal proximity of the police misconduct to the discovery of the challenged evidence. *Id.* at 776.

In *State v. Warndahl*, police ignored the accused's request for counsel and initiated further interrogation that eventually produced a confession. Subsequently, however, the accused himself initiated a conversation with the police, formally waived his right to counsel, and offered a second confession. On appeal, he contended that both confessions were inadmissible, arguing that his second confession was derived sole-

ly from his illegally obtained initial statement. *Id.* at 775. Considering the above factors and giving great weight to the fact that the accused himself initiated the conversation that led to his second confession, this court concluded that only the first confession was inadmissible. *Id.* at 776.

Unlike the accused in *Warndahl*, respondent did not initiate the conversation from which police extracted his confession regarding the alleged St. Paul offenses. There is no reason to interpret Officer Hunter's statement, "I'm very interested in hearing your side of the story," as anything other than an attempt to prompt respondent, in the coercive context of police custody, to incriminate himself. As both the trial court and the court of appeals concluded, all subsequent conversation with respondent was initiated by the police.

Moreover, both the trial court and the court of appeals determined the derivative evidence at issue would not have been discovered absent respondent's illegally obtained confession. As well, the period of time separating the custodial interrogation session in which respondent implicated himself in the alleged St. Paul offenses and the discovery of evidence related to those alleged offenses is not so substantial as to overcome the police misconduct at issue. Thus, the trial court and the court of appeals were correct to conclude that all of the evidence derived from respondent's illegally obtained statements should be suppressed.

## II

I agree with the majority that the decision to suppress the testimony of a witness whose identity is revealed through unconstitutional police conduct requires a more extensive inquiry than does the decision to suppress other, inanimate evidence. I do not agree, however, that the trial court erred in conducting that inquiry.

---

**1.** In *Wong Sun v. United States,* the accused was arrested without probable cause in violation of the fourth amendment. While in custody, he made inculpatory statements that led police to physical evidence they would not otherwise have discovered. The Supreme Court conclud-

ed that because the physical evidence was "come at by exploitation of" the illegally obtained statements, it, like the statements, could not be introduced against the accused at trial. 371 U.S. at 488, 83 S.Ct. at 417–18.

When reviewing the suppression of live witness testimony, this court must weigh the same factors it would in reviewing the suppression of any derivative evidence; it must also consider "whether [suppression] would perpetually disable a knowledgeable witness from testifying at trial." *State v. Seefeldt*, 292 N.W.2d 558, 560 (Minn.1980) (citing *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978)).[2] Whether the witness in question is testifying of her own free will is without question relevant in determining whether her testimony is admissible. *Ceccolini*, 435 U.S. at 276, 98 S.Ct. at 1060. However, whether "the victim's identity was known long before there was any official misconduct" is equally relevant and important for a reviewing court to consider. *United States v. Crews*, 445 U.S. at 472, 100 S.Ct. at 1250.[3]

Weighing *all* of these factors, and taking none as conclusive, it appears to me that the trial court did not clearly err in suppressing testimony from all of the witnesses, including the alleged victim,[4] identified on the basis of respondent's illegally obtained statements. Prior to respondent's custodial interrogation on November 14, 1988, St. Paul police had *no* information with which to identify either a victim of or witnesses to the offenses with which respondent was subsequently charged. As both the trial court and the court of appeals concluded, St. Paul police would not have discovered *any* evidence related to the alleged offenses absent respondent's illegally obtained statements. Officer De Noma's notes included neither the name of an alleged victim nor an address at which the offenses allegedly occurred. Moreover, the information supplied by the restaurant kitchen manager three days after respondent's arrest did not link respondent to any suspected crime. The record before us demonstrates that the only reason St. Paul police connected the alleged victim's name to the offenses allegedly perpetrated by

---

**2.** *Seefeldt* significantly departed from this court's previous decisions in *State v. King*, 286 Minn. 392, 176 N.W.2d 279 (1970), and *State v. Johnson*, 291 Minn. 407, 192 N.W.2d 87 (1971), in which it adopted a *per se* rule prohibiting suppression of live witness testimony under any circumstances. However, *King* and *Johnson* were each decided before *United States v. Ceccolini*, 435 U.S. at 274–75, 98 S.Ct. at 1059 (1978), in which the United States Supreme Court expressly rejected an identical *per se* rule and on which this court specifically relied in *Seefeldt*. *See also United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (applying established derivative evidence rule analysis in reviewing suppression of live witness testimony); *United States v. Feldhacker*, 849 F.2d 293, 296 (8th Cir.1988) (derivative evidence rule does not apply to live witness testimony only because witness would have inevitably been discovered by lawful means); *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir.1987) (derivative evidence rule bars admission of physical evidence and live witness testimony obtained through exploitation of a constitutional violation). Our decisions in *State v. King* and *State v. Johnson* must therefore be limited to their pre-*Ceccolini* facts and are inapplicable to the case before us.

**3.** The majority suggests *Crews*, 445 U.S. at 472, 100 S.Ct. at 1250, supports its conclusion that the testimony of witnesses discovered solely because of respondent's illegally obtained state-

ments should remain admissible at trial. We note, however, as did the Supreme Court, that in *Crews*

> the robbery victim's presence in the courtroom at respondent's trial was surely not the product of any police misconduct. She had notified the authorities immediately after the attack and had given them a full description of her assailant. The very next day, she went to the police station to view photographs of possible suspects, and she voluntarily assisted the police in their investigation at all times.

*Id.* at 471, 100 S.Ct. at 1250. Further, the *reliability* of live witness testimony—the issue addressed in that portion of *Crews* the majority extracted—is only *one* factor in determining whether that testimony should be suppressed by virtue of the derivative evidence rule. *See id.* at 473 n. 19, 100 S.Ct. at 1251 n. 19 (resolution of the reliability issue does not completely resolve the considerations underlying the *Wong Sun* derivative evidence rule).

**4.** The majority's repeated references to "the victim" require mention that the "facts" surrounding the alleged offenses at issue were adduced from police reports and from the pretrial testimony of police officers; none of these "facts" have been proven true. Further, I find it necessary to state my strong objection to the majority's unequivocal conclusion, absent the benefit of either a plea of guilty or the conclusions of a factfinder, that respondent is indeed guilty of the offenses with which he is charged.

respondent on October 17 was their knowledge of respondent's illegally obtained November 14 confession. In reaching this conclusion, I give great weight to the trial court's finding that neither the alleged victim nor her parents had any intention of independently reporting the alleged October 17 incident to police and eventually did so only in response to police inquiries generated by respondent's own inculpatory statements.

Without question, serious consequences attach to the exclusion of live witness testimony, particularly that of an alleged victim. However, the majority is unwise to manufacture a rule permitting the introduction of that testimony irrespective of what tactics were employed to secure it. Such a rule virtually destroys any reason police may now have for respecting the right to counsel once invoked, and instead creates a substantial incentive for police to completely ignore constitutional limitations in eliciting self-incriminating statements. There is simply no reason to believe that police will see any need to respect a suspect's invocation of the right to counsel when they know that the *most* they will ever lose access to is the confession itself.

In the particular circumstances presented by the case before us, where police were entirely unaware of a victim, of witnesses, indeed of anything arguably constituting an offense involving respondent until respondent himself confessed in an illegally obtained statement, suppression of *all* evidence derived from that statement is appropriate.[5]

### III

In *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court concluded that illegally obtained information is admissible where the state demonstrates "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means * * *." *Id.* at 444, 104 S.Ct. at 2509.[6] In *Nix,* the state proved by a preponderance of the evidence that a body police discovered owing to an illegally obtained confession would inevitably have been discovered by search parties already at work and "approaching the actual location of the body." *Id.* at 449, 104 S.Ct. at 2512.

This court has itself applied the *Nix* inevitable discovery exception to permit introduction of illegally obtained evidence. In *State v. Rodewald,* 376 N.W.2d 416 (Minn. 1985), this court held that blotter acid discovered by a police officer during a pre-detention search of the defendant's wallet was admissible. *Id.* at 422. The court reasoned that irrespective of any illegality involved in the officer's search, the acid would unquestionably have been discovered by jail personnel during a lawful inventory search mandated by established jail procedure. *Id.*

The trial court made extensive findings with respect to the likelihood that the alleged St. Paul offenses would have been discovered absent respondent's inculpatory statements. It found that the kitchen manager of the restaurant where SC, the alleged victim, was employed, informed St. Paul police only that respondent also worked at the restaurant for one week and was terminated because "he treated waitresses strange" and called SC and another restaurant worker, TH, at their homes. The court concluded a fair preponderance of the evidence did not demonstrate that without respondent's inculpatory state-

---

5. I unequivocally reject the majority's clear suggestion that respondent's conviction of a heinous crime in Hennepin County has some bearing on the appropriate outcome of this appeal. That respondent may be an evil person capable of despicable conduct plays no part in determining whether police inexcusably overstepped constitutional boundaries in discovering the alleged victim and the physical evidence she made available.

6. The state expressly declined to argue that the derivative evidence at issue remained admissible because it was obtained from a source demonstrably independent of respondent's illegally obtained statements. Further, the state did not argue before the trial court that the discovery of the alleged St. Paul offenses was so attenuated from respondent's illegally obtained confession as to cure the taint imposed on that evidence by the police misconduct; it raises that argument for the first time in this appeal.

ments the St. Paul Police Department would have mounted an investigation based on this information. The court noted that of the two women the kitchen manager referred to, SC and TH, the police chose only to interview SC. It concluded that because police did not initiate an investigation as to TH based solely on the kitchen manager's information, they likely would not have initiated an investigation as to SC absent knowledge of respondent's inculpatory statements. Finally, the court was persuaded that the state did not demonstrate that either SC or any member of her family—none of whom testified—would ever have come forward and given evidence about respondent.

The court of appeals agreed "with the trial court's conclusion that it is too speculative to assume the victim's family would have reported the crime after earlier declining to formally do so." *State v. Doughty,* 456 N.W.2d 445, 449 (Minn.App.1990). It also agreed with the trial court that the kitchen manager did not provide St. Paul police with a connection between respondent and a suspected crime. Like the trial court, the court of appeals noted that because police did not initiate an investigation with respect to TH, there was no reason to believe they would yet have interviewed SC solely on the basis of the information provided by the kitchen manager.

The record before us supports the trial court's determinations. The state did not offer testimony from Officer De Noma regarding what he likely would have done with his October 17 notes absent knowledge of respondent's inculpatory statements.[7] Officer Pye, whom the trial court observed testify and whose credibility the trial court therefore had the opportunity to assess, was the only witness called to speculate about what Officer De Noma would

have done with his notes and what action would have been taken because of those notes had the police not already known about respondent's illegally obtained confession. Further, Officer De Noma's notes were not connected with respondent until November 17, three days after St. Paul police first learned of the alleged St. Paul offenses from St. Louis Park police.

The state also chose not to call SC or any member of her family to testify with respect to what they would have done had a St. Paul police officer not contacted them after he learned of respondent's inculpatory statements. As both the trial court and the court of appeals concluded, because St. Paul police did not follow-up on the kitchen manager's information regarding TH, there is no reason to believe they would have followed-up identical information regarding SC absent knowledge of respondent's illegally obtained confession. The record we are asked to review simply does not demonstrate the trial court clearly erred in refusing to apply the inevitable discovery exception.

IV

Because none of the evidence the state seeks to offer at trial would have been discovered absent respondent's inculpatory statements elicited in violation of his fifth amendment right to counsel, I would affirm the trial court's suppression order. The record before this court does not demonstrate the trial court erred in its determination that even the live witness testimony derived solely from respondent's illegally obtained statements should be suppressed. I reiterate that *none* of the alleged facts surrounding the alleged October 17 incident have been proved by the state. The majority's conclusions with respect to those

7. In a motion before the trial court for reconsideration or clarification, the state asserted "[t]he witness were [sic] not called at the original hearing because the Minnesota Supreme Court has indicated that lay or non-police witnesses should ordinarily not be called at a pre-trial hearing * * *." It cited *State v. Rud,* 359 N.W.2d 573 (Minn.1984), in support of this assertion. *Rud,* however, dealt with a defendant's attempt to call an alleged victim as an exonerat-

ing witness at a probable cause hearing. *Id.* at 578–79. *Rud* does not indicate the state was prohibited from calling the alleged victim, her parents, Officer De Noma, or any other witness with respect to the specific issue of inevitable discovery. Indeed, nothing in the record indicates the state was in any way hindered in offering something other than the speculative testimony of police officers to support its assertions.

allegations should therefore be wholly disregarded on remand.

WAHL, Justice (dissenting).

I join the dissent of Justice Tomljanovich.

