NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

v.

JOHN HYRAM THOMPSON, JR., *Appellant*.

No. 1 CA-CR 19-0154
FILED 5-12-2020

Appeal from the Superior Court in Yavapai County
No. V1300CR201680567
The Honorable Michael R. Bluff, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

The Zickerman Law Office, PLLC, Flagstaff
By Adam Zickerman
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Presiding Judge David D. Weinzweig delivered the decision of the Court, in which Judge Jennifer M. Perkins and Judge James B. Morse Jr. joined.

_____

**W E I N Z W E I G**, Judge:

¶1   John Hyram Thompson, Jr. appeals his convictions and sentences for several felonies.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2   Daniel received several frantic text messages from his ex-girlfriend, Melissa, who beckoned for help, warning she was being held captive at a particular address in Clarkdale and would "be dead by tomorrow."  Daniel reported Melissa's troubling messages to Clarkdale Police.  He was then connected by cell phone to a patrol officer and confirmed the text messages.  Daniel relayed Melissa's phone number to police and said he last heard from Melissa "a couple seconds ago."  Melissa did not answer calls from Daniel or the police.

¶3   Police responded to the reported address, where Thompson lived in his trailer, which was surrounded by surveillance cameras, a perimeter, chain-link fence and "Private Property" and "No Trespassing" signs.  A vehicle registered to Thompson was visible from the street.  Thompson was known to Clarkdale Police after "previous aggressive or angry encounters with law enforcement," and officers were warned to call for "backup" in future encounters.  Daniel again called the police officers as they surveyed the property, reiterating his report and providing a physical description of Melissa.  One of the officers had seen a woman matching Melissa's description at Thompson's place only days before.

¶4   The police officers entered the front gate, which was unlocked, and knocked on the front door.  Thompson eventually answered and walked onto the porch.  The officers explained they were performing a welfare check and asked whether anyone else was inside the trailer.  Thompson insisted "three or four times" that nobody was inside and refused permission to search the trailer.  He seemed "nervous" and could not initially locate his identification.

¶5           The police chief scrambled to the scene as questioning continued because officers had made no progress with Thompson despite the emergent circumstances. The chief immediately approached Thompson to determine whether "somebody inside [his] trailer [was] being held against their will," explaining that officers would not leave until their concerns were dispelled, and adding that "provisions [of the law] allow us to do that." Thompson then admitted his "girlfriend" was in the trailer, which "absolutely" raised "red flags" for the officers. Thompson offered to retrieve his girlfriend, but the police chief refused, now concerned about the safety of his officers if Thompson left his sight. The chief therefore yelled for Melissa from the front door. She did not respond, heightening his concern. Officers entered the trailer and found Melissa half-asleep in the bedroom.

¶6           Melissa was escorted from the trailer by police officers who described her as "groggy" and "disoriented." She had a "fresh needle mark" on her arm and conceded injecting heroin the previous night. Melissa later confirmed she sent text messages to Daniel for help. She also described her brief relationship with Thompson. According to Melissa, the relationship turned violent after the first night, when Thompson began restricting her movement and twice "chok[ing] her out to the point of unconsciousness." Melissa was afraid that Thompson was "digging [her] grave" outside. Melissa added that Thompson had black-tar heroin and high-powered guns in his trailer. Thompson was arrested.

¶7           Police secured a warrant to search Thompson's trailer based on information collected from Melissa and the department's internal knowledge of Thompson. The search yielded over 32 grams of heroin, a digital scale with "brownish" residue, methamphetamine, psilocybin mushrooms, radio scanners and a list of frequencies used by police, ammunition and nine firearms, including an AR-15 style rifle. Officers also found unused syringes, syringes filled with black fluid, and used pipes with "white residue."

¶8           Thompson was indicted on 18 felonies, including possession of narcotic drugs for sale, possession or use of dangerous drugs and possession of drug paraphernalia, misconduct involving weapons and theft.

¶9           Thompson moved to suppress all evidence recovered from the search of his trailer, arguing the search warrant was supported, in part, with information obtained in violation of the Fourth Amendment. The court held a hearing and denied the motion. Thompson also objected to the

prosecutor's opening and closing statements as unfairly prejudicial. Both objections were overruled. The jury found Thompson guilty of 15 felony counts, including one count of possession of narcotic drugs, two counts of possession of dangerous drugs, nine counts of misconduct involving weapons, and three counts of possession of drug paraphernalia.

¶10 Thompson timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1), 13-4031 and -4032(6).

## DISCUSSION

### I. Motion to Suppress

¶11 Thompson first argues the superior court should have suppressed all evidence seized from his trailer because the search warrant was based on information provided by a person (Melissa) found during a prior warrantless search in violation of the Fourth Amendment. The State counters that police officers lawfully entered Thompson's yard and trailer under the emergency aid exception to the warrant requirement because they reasonably believed that a person within the residence needed immediate aid or assistance.

¶12 We review the superior court's ruling on a motion to suppress evidence for a clear abuse of discretion. *State v. Spears*, 184 Ariz. 277, 284 (1996). "We look only to the evidence presented at the suppression hearing, and we view the facts in the light most favorable to upholding the trial court's ruling." *State v. Moore*, 183 Ariz. 183, 186 (App. 1995). "[W]e defer to the trial court's factual findings, including findings on credibility and [on] the reasonableness of the inferences drawn by the officer, but we review de novo mixed questions of law and fact and the trial court's ultimate legal conclusion[]" whether a search was lawful. *State v. Teagle*, 217 Ariz. 17, 22, ¶ 19 (App. 2007).

¶13 The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV; *State v. Wilson*, 237 Ariz. 296, 298, ¶ 7 (2015). A warrantless search is reasonable only if it falls under an exception to the warrant requirement. *Riley v. California*, 573 U.S. 373, 382 (2014). At issue here is the emergency aid exception, which applies "when (1) the police have reasonable grounds to believe an emergency exists that requires their immediate assistance to protect life or property and (2) a reasonable basis

4

exists to associate the emergency with the place to be searched." *State v. Bennett*, 237 Ariz. 356, 359, ¶ 9 (App. 2015).

¶14 We find no abuse of discretion. Police officers received specific and credible information that a particular person (Melissa) was being held against her will at a particular address; indeed, the threatened person had reached out for help and expressed a fear for her life. The reporter (Daniel) confirmed this information multiple times. Moreover, one police officer had recently seen a woman on Thompson's property who matched Melissa's description. Then, Thompson lied several times to police officers who responded—denying that anyone else was inside the trailer—until conceding the opposite after he was confronted by a determined police chief. The officers reasonably described the about-face as a "red flag." Even then, police only entered the trailer after Melissa did not answer their calls from the front door. The officers acted reasonably under the circumstance. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (the touchstone of the Fourth Amendment is "reasonableness").

¶15 Thompson's arguments are not persuasive. He first describes Daniel's reports as "confused," "incoherent" and "stale," but Daniel contacted police with specific information (name, address, physical description) about a specific threat, which he repeated three different times, including "[a] couple seconds" after his last contact with Melissa. Thompson then argues he had revoked the public's limited license to approach the curtilage of his home, citing *State v. Lohse*, 245 Ariz. 536, 540-41, ¶¶ 10-13 (App. 2018), but that argument ignores the emergency aid exception, *Stuart*, 547 U.S. at 403. We affirm the court's denial of Thompson's motion to suppress.[1]

---

[1] Because we find that the emergency-aid exception applies, we do not address whether Melissa's post-rescue statements should not have been included in the warrant affidavit under the fruit of the poisonous tree doctrine. *See State v. Price*, 27 Ariz. App. 673, 677 (1976) ("We fail to see how the purpose of deterring unlawful police conduct would be furthered by suppressing the testimony of known victims of the armed robberies."); *see also United States v. Ceccolini*, 435 U.S. 268, 274-75 (1978) (noting that "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object"); *State v. Doughty*, 472 N.W.2d 299, 307 (Minn. 1991) (stating that under *Ceccolini* the question

## II.     Thompson's Motions for Mistrial

**¶16**          Thompson next claims the court should have declared a mistrial based on improper remarks by the prosecutor in opening and closing statements.  We review the superior court's denial of a motion for mistrial for an abuse of discretion, *State v. Sanders*, 245 Ariz. 113, 128, ¶ 61 (2018), reversing only if defendant shows a reasonable likelihood that comments could have affected the jury's verdict, *State v. Gallardo*, 225 Ariz. 560, 569, ¶ 40 (2010), and affording great deference to the superior court, *State v. Lamar*, 205 Ariz. 431, 439, ¶ 40 (2003).

**¶17**          Thompson argues for a mistrial because the prosecutor referred to an ongoing investigation in his opening statement and alluded to mass shootings in his closing argument.  But Thompson makes almost no effort to show a reasonable likelihood that the statements affected the trial.  Furthermore, the superior court twice instructed the jury that opening and closing statements are not considered evidence.  We presume the jurors followed their instructions.  *State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006).  We find no error.

## CONCLUSION

**¶18**          We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA

---

is "whether the victim or witness is testifying of her own free will rather than at the compulsion of the state resulting from the discovery of her name through illegal means").