# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1493

_____

United States of America

*Plaintiff - Appellee*

v.

Coleman Tuton

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Texarkana

_____

Submitted: January 12, 2018
Filed: June 25, 2018

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Coleman Tuton conditionally pleaded guilty to possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Tuton appeals the district court's[1] denial of his motion to suppress eight pounds of cocaine seized from his

_____

[1]The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas.

luggage during an extended traffic stop of a bus he was riding from El Paso, Texas to Chicago. Reviewing the district court's legal conclusions *de novo* and fact findings for clear error, we affirm. United States v. Holleman, 743 F.3d 1152, 1155 (8th Cir.), cert. denied, 134 S. Ct. 2890 (2014) (standard of review).

## I. Background

While patrolling Interstate 30 on November 6, 2014, Corporal Chris Goodman, a twelve year veteran of the Arkansas State Police, stopped a Tornado bus for following a tractor trailer too closely. See Ark. Code Ann. § 27-51-305. At the suppression hearing, Goodman testified that traffic enforcement was an important part of his duties, but he was also a member of an Interstate Criminal Patrol Team that had "saturate[d]" this portion of I-30 with patrol cars and canine units, seeking to uncover evidence of criminal activity by those who were legitimately stopped for traffic violations. In this capacity, Goodman had attended drug interdiction training at the federal El Paso Intelligence Center and regularly received High Intensity Drug Trafficking Area summaries identifying methods being used by those smuggling drugs across the country. These intelligence summaries had reported "countless" seizures of contraband from Tornado buses, a bus line popular along the U.S.-Mexico border, and that drug traffickers were storing drugs in unlabeled, apparently abandoned luggage to keep police from linking a bag to a passenger if drugs were discovered in the luggage.

After the stop, in a brief conversation with the bus driver, Jose Soto, Goodman observed Soto's "hands were trembling" and his voice was "pretty nervous and shaky." Goodman found this odd because a professional driver typically interacts more comfortably with law enforcement and regulatory authorities than the average driver. Soto provided his commercial driver's license, said four passengers were on the bus, and said he was driving to Milwaukee from southern Texas. Examining the passenger manifest, Goodman noted the passengers were en route to Chicago, not

Milwaukee. He thought it suspicious that a bus company would undertake a costly cross-country trip with only four passengers.

Approximately two minutes after making contact, Goodman asked Soto if there was any contraband on the bus and if he could search the bus. Goodman testified that he quickly asked for consent because, had Soto refused, Goodman would have time to call for one of the nearby canine units while he completed the traffic stop.[2] Soto consented to the search and opened three doors to a luggage compartment in the bus's undercarriage. Goodman saw five or six bags with name tags hanging off their handles inside the far right door. On the left side of the middle door, Goodman testified, "was a black bag all by itself with no apparent markings of any kind, no name tag associated with it, nothing." Seeing no name tag "made me think that it was either the driver's luggage because he wouldn't put a name tag on his own luggage or it was someone who didn't want me to know whose bag it was. . . . [I]t was an unclaimed bag for that reason."

Goodman opened the black bag in the luggage compartment and reached inside, feeling what he believed was a false bottom. While trying to access the hidden compartment, Goodman saw a name tag bearing Tuton's name trapped beneath the bag's collapsed handle. Goodman stopped searching the bag, requested a canine unit, and entered the bus to question the passengers. One passenger had his luggage above the seat and consented to a search. Goodman testified that passenger Tuton was "very nervous," the only passenger who appeared to avoid eye contact with him. Tuton said his journey began in El Paso, where Goodman knew "a lot of drugs cross the border . . . and then are distributed . . . all across the country." Tuton's explanation why he chose to take the bus rather than fly "didn't make sense." He initially said he did not

---

[2]Law enforcement officers "need not obtain consent to conduct a dog sniff during an otherwise lawful encounter." United States v. Grant, 696 F.3d 780, 784 (8th Cir. 2012), cert. denied, 571 U.S. 832 (2013).

-3-

fly because the plane ticket was too expensive, but then said a plane ticket would have cost $120.00 when he paid $192.00 for the bus ticket. Goodman testified that he did not know what was in the false compartment of Tuton's bag but suspected drugs were hidden there. Asked why he did not ask Tuton for consent to search, Goodman replied:

> I thought is the consent tainted if for some reason [Tuton] saw me already looking in his bag . . . . I feel like the most neutral thing to do will just be have a dog come run the bus . . . the dog doesn't know anything about what I did . . . . He just runs, and he tells us whether he smells the drugs he's trained to smell or not.

About four minutes after Goodman requested the canine unit, Corporal Rocky Rapert arrived with his drug-detection dog, Hemi. Goodman asked that Hemi sniff one suitcase, but Rapert said he would deploy Hemi on the entire luggage compartment. At the suppression hearing, Rapert explained this practice strengthens the reliability of any alert because a handler who directs his dog to sniff only one bag can be accused of having "cued" a false alert.

Hemi jumped into the luggage compartment and immediately showed behavioral changes. He assumed an excited posture, normal for being "in the odor of narcotics," closed his mouth, breathing just through his nose, and focused his sniffing on the back side of the luggage area. When Rapert pulled Hemi away from the luggage compartment, Hemi resisted leaving. Rapert concluded Hemi had given a "profound alert," a behavior change that any lay person would notice, which is a more definitive signal of drug detection than a "normal alert," a change detectible only by the handler. Though Hemi sniffed the individual bags in the compartment, he did not give a "final indication" on any bag -- when Hemi sits or stands before and stares at the source of the drug odor he is detecting. Based on the profound alert, Rapert advised Goodman that Hemi's behavior provided probable cause to search for drugs in the luggage compartment. Officers searched all the bags and, in Tuton's,

-4-

found eight pounds of cocaine after breaking into the false bottom. Tuton confessed to transporting the cocaine in a post-arrest interview.

In denying Tuton's motion to suppress, the district court concluded: (i) Corporal Goodman conducted a lawful traffic stop and had reasonable suspicion to investigate whether the bus was transporting contraband; (ii) Goodman's warrantless search of the bag without probable cause, reasonable suspicion, or consent violated passenger Tuton's Fourth Amendment rights; (iii) Hemi's profound alert provided a lawful, independent source of probable cause to justify search of the bags in the compartment; and (iv) "all the facts surrounding [Hemi's] alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Florida v. Harris, 568 U.S. 237, 248 (2013).

## II. Discussion

**A.** On appeal, Tuton first argues that he was unconstitutionally seized when Corporal Goodman unreasonably expanded the traffic stop by asking bus driver Soto if there was any contraband in the bus and if Goodman could search the bus. This contention is without merit. It is of course true that "[a] seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." Rodriguez v. United States, 135 S. Ct. 1609, 1612 (2015) (quotation omitted). Here, Corporal Goodman asked bus driver Soto for consent to search the bus only two minutes after the traffic stop began. The Fourth Amendment did not prohibit Goodman "from asking questions unrelated to the traffic stop, from seeking consent to search the [bus], or even from asking if [Soto] would wait for the canine unit to arrive." United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001). Soto did consent to a search, which "necessarily consent[ed] to an extension of the traffic stop while the search [was] conducted." United States v. Rivera, 570 F.3d 1009, 1013 (8th Cir.

2009). Passenger Tuton had no authority to override Soto's consent, and Tuton was not seized during the search; he made the decision to ride the bus to his destination. See Florida v. Bostick, 501 U.S. 429, 436 (1991); United States v. Slater, 411 F.3d 1003, 1005 (8th Cir. 2005).

**B.** Tuton next argues that the initial, unlawful search of his bag requires suppressing the later-discovered evidence because Corporal Goodman would not have requested the canine unit had he not unlawfully discovered the bag's false bottom, and without Hemi's alert officers would have lacked probable cause to search the bag and discover eight pounds of cocaine. The exclusionary rule extends to "evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984) (citations omitted). If the defendant establishes a nexus between a constitutional violation and the discovery of evidence sought to be excluded, the government must show the challenged evidence did not arise "by exploitation of that illegality . . . [but] instead by means sufficiently distinguishable to be purged of the primary taint." United States v. Hastings, 685 F.3d 724, 728 (8th Cir. 2012), cert. denied, 568 U.S. 1134 (2013), quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963). The illegality must be at least a "but-for cause of obtaining the evidence." United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007).

The district court found that discovery of the cocaine was not caused by Goodman's prior unlawful search of the bag because "Hemi's sniff and subsequent alert was unaffected by the previous unlawful search. . . . Alternatively, any possible causal connection . . . is so attenuated that any taint of the unlawful search is purged." On appeal, acknowledging that Goodman testified he would have called for a canine unit anyway, Tuton argues that the close temporal proximity between Goodman's discovery of the false bottom, discovery of Tuton's name tag, ceasing his search of the bag, calling for a canine unit, and directing dog handler Rapert to a bag with a

false compartment "supports the conclusion that [Hemi's] sniff was tainted by the unconstitutional discovery of the false compartment."

This argument has considerable force, but we reject it for two reasons. First, as the district court noted, Goodman testified that his suspicions were raised before he received consent to search the luggage compartment, and he would have called for a canine unit even had he not discovered the false bottom in Tuton's bag. This is supported by his testimony that he asked Soto for consent early in the encounter so that, if Soto refused, there would be time for a canine unit to arrive before Goodman completed the traffic stop. Of course, in that event, the dog would have sniffed from outside the closed luggage compartment, but Soto's consent provided whatever consent was needed to enter the compartment where Hemi alerted. The district court necessarily credited Goodman's testimony in finding that Hemi's alert was not tainted by Goodman's prior search of the bag. Deferring to that credibility determination, as we must, we conclude the district court committed no clear error. See United States v. Gregory, 302 F.3d 805, 811 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003).[3]

Second, although the government has not challenged the district court's conclusion that Goodman's initial search of the bag was unlawful, that issue requires clarification. We agree with the court that passenger Tuton had a protected privacy interest in properly tagged luggage stowed in the bus's luggage compartment. But

---

[3]The dissent asserts that Goodman's decision to call for a canine unit "was necessarily informed by the knowledge he had obtained through the initial search." *Infra* at 12. We disagree. Goodman's suspicions were sufficiently aroused at the start of the traffic stop that he immediately asked for consent to search so there would be time to call for a canine unit if Soto did not consent. So the question becomes, having gained consensual access to the luggage compartment, if Goodman had seen the isolated bag with no apparent name tag but felt constrained not to open it, would he nonetheless have called for the canine unit? Logically, the answer is yes. If the suppression issue turned on this question (in our view it does not), remand for a specific finding would be the proper disposition of the appeal.

the court did not focus on the brief, isolated, and good faith nature of Goodman's unlawful search. Goodman had received law enforcement communications reporting that drug traffickers were smuggling illegal drugs in unlabeled, apparently abandoned luggage so they could not be identified if the drugs were discovered. When he found an isolated bag matching that description in the luggage compartment of a bus that had aroused his suspicion of criminal activity, Goodman believed he could search the bag as abandoned property. It is "firmly established that a warrantless search of abandoned property is not unreasonable and does not violate the Constitution." United States v. Sanders, 130 F.3d 1316, 1317 (8th Cir. 1997). Like other fact-intensive Fourth Amendment issues, "[w]hether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably." Illinois v. Rodriguez, 497 U.S. 177, 186 (1990).

Of even greater significance, when Goodman found Tuton's name tag and realized he had made a mistake of fact, he immediately ceased his search of the bag and called for a canine unit, concluding that having a drug dog sniff the reclosed bag was the "neutral" way to determine whether his suspicion that the false bottom contained drugs was correct. Even if this decision was based on his discovery of the false bottom in a bag he believed was abandoned property, the decisive question becomes whether the subsequently discovered cocaine must be suppressed because it was tainted by information acquired in this manner. The exclusionary rule's "sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 236-37 (2011). "[W]hen the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" Id. at 238 (citations and quotations omitted); see United States v. Davis, 760 F.3d 901, 904-05 (8th Cir. 2014) (exclusionary rule did not apply to warrantless dog sniff based on prior precedents cast in doubt by a recent decision), cert. denied, 135 S. Ct. 996 (2015). We need not

decide whether the initial search of the bag, in isolation, was objectively reasonable. Instead, we conclude that, as in Utah v. Strieff, 136 S. Ct. 2056, 2063 (2016), even if Goodman acted unreasonably in opening what he believed to be abandoned property, his conduct after discovering the mistake was lawful, and "all the evidence suggests that the [mistake] was an isolated instance of negligence that occurred in connection with a bona fide investigation." In these circumstances, the exclusionary rule does not apply to suppress evidence discovered in a subsequent search that was validated by Hemi's alert.

**C.** Finally, Tuton challenges the validity of Hemi's probable cause alert on multiple grounds. First, he argues that "[t]he possibility of inadvertent cuing should have been factored in to the officers' probable cause analysis" because Corporal Rapert knew before Hemi began that one of the bags contained a false bottom, information unlawfully acquired that compromised the integrity of Hemi's alert. The district court rejected this contention, finding "no evidence to suggest that Corporal Rapert cued the dog to alert to the presence of narcotics." Common sense suggests that inadvertent cuing is an unlikely explanation for Hemi's *sustained* profound-alert behavior in the luggage compartment. See United States v. Carbajal, 449 F. App'x 551, 555 (8th Cir. 2012) (per curiam), cert. denied, 568 U.S. 1195 (2013). There was no clear error in finding that the unlawful search did not affect Hemi's alert.

Tuton next argues that Hemi's alert, even if not tainted by Goodman's unlawful search of Tuton's bag, did not provide probable cause to search bags in the luggage compartment. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." United States v. Donnelly, 475 F.3d 946, 955 (8th Cir.), cert. denied, 551 U.S. 1123 (2007). In determining whether a dog's alert establishes probable cause to search an area, the inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a

reasonably prudent person think that a search would reveal contraband or evidence of a crime." Harris, 568 U.S. at 248.

"[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." Id. at 246. Here, Corporal Rapert testified that he and Hemi completed a 320-hour training course in 2013, and that Hemi had earned a high accuracy rating for positive and negative alerts and had trained in varied environments. Compare Donnelly, 475 F.3d at 955. Tuton argues that any alert Hemi gave was unreliable because he was operating in an unfamiliar environment -- according to training records, he had not previously been deployed on a passenger bus in a real-world scenario. But Tuton and his expert presented no evidence supporting this speculative theory. Hemi had trained both on a bus and on the side of a highway. Lack of prior, comparable real-world experience does not preclude a finding that a dog's alert was reliable. See United States v. Jackson, 811 F.3d 1049, 1051 (8th Cir. 2016) (dog's positive alert in "her first field operation" provided probable cause to search defendant's aircraft).

Tuton further argues Hemi did not reliably alert because he never provided a final indication of a drug source, as he had been trained to do; he merely showed interest in the luggage compartment, which was not a reliable "alert." This contention is contrary to Corporal Rapert's testimony, credited by the district court, that Hemi repeatedly gave a "profound alert" to the odor of narcotics in the luggage compartment. Sergeant Roby Rhoads, head of the Arkansas State Police's canine certification program, also testified that Hemi's behavior amounted to a profound alert. In Holleman, we rejected the contention that a final indication is required to establish probable cause. 743 F.3d at 1156-57. We noted testimony, consistent with Corporal Rapert's and Sergeant Rhoads's testimony in this case, that a dog can be so overwhelmed by the odor of narcotics that it has "difficulty pinpointing the strongest source of the odor." Id. at 1157; see Carbajal, 449 F. App'x at 555.

Finally, Tuton argues, even if Hemi gave a reliable profound alert, it was directed only to the luggage compartment, not to the bags in the compartment, which Hemi sniffed but then returned to sniffing the compartment wall. Therefore, the district court's conclusion that Hemi's general alert gave officers probable cause to search the bags would mean that a dog's alert to a luggage compartment that contained hundreds of bags would justify a warrantless search of every bag. This argument, while it parades a legitimate "horrible," ignores that the determination of probable cause depends on the totality of the circumstances, which included Corporal Goodman's suspicions as well as Hemi's profound general alert. See Donnelly, 475 F.3d at 955; Carbajal, 449 F. App'x at 554.

Hemi gave a repeated profound alert in an otherwise empty luggage compartment. Corporal Goodman knew that drug traffickers had often traveled on the Tornado bus line and observed that bus driver Soto was uncharacteristically nervous. He knew that passenger Tuton's journey began in El Paso and observed that Tuton, one of only four passengers, was nervous, evasive, and gave inconsistent answers about the nature of his trip. We agree with the district court that these circumstances, viewed through the lens of common sense, created a "fair probability that contraband or evidence of a crime will be found " in the seven pieces of luggage in the compartment where Hemi alerted. Donnelly, 475 F.3d at 954, quoting Illinois v. Gates, 462 U.S. 213, 238 (1983). This conclusion obviously does not mean that hundreds of bags in the luggage compartment of another bus could be searched without consent or a warrant based on a drug dog's general alert. The Fourth Amendment probable cause inquiry is always fact specific. With Hemi's profound alert, Goodman had probable cause to search Tuton's bag because he was the only nervous and evasive bus passenger. The dissent's assertion that Hemi's alert did not provide probable cause to search the other six bags is of no moment. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (quotation omitted).

-11-

The judgment of the district court is affirmed.

KELLY, Circuit Judge, dissenting.

I agree that the driver of the Tornado bus willingly gave Corporal Goodman permission to search the bus for contraband. When Goodman looked in the luggage compartment and noted one bag separated from the others and without a visible name tag, he assumed—without any further inquiry—that the bag was abandoned, thereby giving him the right to search. Cf. Sanders, 130 F.3d at 1317. But Goodman made no attempt to discover the owner of the bag—which did, in fact, have a name tag attached to it—and his assumption was not reasonable under the circumstances. Thus, I agree with the district court that this was an unlawful search.

Tuton argues that, as a result of this unlawful search, any evidence seized from the bag must be suppressed. This is so, he maintains, because "the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." Segura, 468 U.S. at 804 (cleaned up). Nonetheless, the district court applied the independent source doctrine, see Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920), and concluded that "Hemi's sniff and subsequent alert was unaffected by th[is] previous unlawful search." This conclusion was based in large part on Goodman's testimony that he would have called for a canine unit even if he had not found the false bottom in Tuton's bag. Even if the district court did credit Goodman's testimony,[4] however, Goodman did not call for the canine unit until *after* he reached in the bag, i.e., after the Fourth Amendment violation had already occurred. Under these circumstances, when his decision was

---

[4]The court states that the district court "necessarily credited Goodman's testimony" based on the ultimate conclusion it reached, but the district court made no explicit credibility determination.

-12-

necessarily informed by the knowledge he had obtained through the initial search, Goodman's after-the-fact, hypothetical assertion is insufficient to purge the taint.[5]

I also disagree that Hemi's "profound alert" provided Goodman with independent probable cause to search all the bags located in the luggage compartment of the bus. "The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Harris, 568 U.S. at 248. I agree with the court that, under our precedent in Holleman, a dog need not give a so-called "final indication" in order to establish probable cause in every case.[6] But Holleman does not establish that an alert, in the absence of a final indication, will always satisfy the probable cause requirement. 743 F.3d at 1156–57. Instead, we must look at the facts in each case to make that determination.

In Holleman, Henri, the drug dog, was directed to sniff the exterior of a truck owned by Holleman, the defendant. Id. at 1154. Henri alerted to the outside of Holleman's truck twice, but did not give a final indication of where on the outside of the truck the odor was strongest. Id. We held that Henri's "full alert"—as compared with the mere "interest" shown by a drug dog in United States v. Jacobs, 986 F.2d

---

[5]The district court concluded, in the alternative, that "any possible causal connection between the unlawful search and the discovery of the cocaine is so attenuated that any taint of the unlawful search is purged." See Hamilton v. Nix, 809 F.2d 463, 465–66 (8th Cir. 1987) (en banc) (citing United States v. Ceccolini, 435 U.S. 268, 273–80 (1978)). The district court did not provide further explanation, but I see no attenuation under this set of facts that is sufficient to purge the taint.

[6]But cf. United States v. Heir, 107 F. Supp 2d 1088, 1091 (D. Neb. 2000) (finding a lack of probable cause where a drug dog exhibited "subtle" alert behavior—akin to the court's description of a "normal alert" in this case—that "might only be recognized by" a person familiar with that particular dog).

1231, 1233 (8th Cir. 1993)—was sufficient to establish probable cause to search Holleman's truck. Holleman, 743 F.3d at 1156–57. But, here, Hemi did not sniff the outside of a personal vehicle. Rather, Hemi had complete access to the entire inside of the luggage compartment of a commercial bus containing bags owned by multiple travelers, each with his or her own individual, reasonable expectation of privacy. Inside that compartment were seven bags. And yet, even when he was allowed to sniff each of them individually, Hemi showed no interest in any of the bags. Instead, he returned repeatedly to the back wall of the luggage compartment. Of course, as the government witnesses posited, it is possible that Hemi was overwhelmed by the odor because he was operating in an unfamiliar environment. But that possibility undermines, rather than enhances, the reliability of Hemi's alert on any particular spot. In light of Hemi's alert to the luggage compartment, his disinterest in the bags, and his strong interest in the compartment's rear wall, it is my view that Goodman lacked probable cause to conduct a search of each individual piece of luggage in the compartment.[7]

    For these reasons, I respectfully dissent.

_____

---

    [7]And while the court is correct that "[t]he Fourth Amendment probable cause inquiry is always fact specific," its dismissal of the "legitimate horrible" wherein a dog's "general alert" to the entire luggage compartment of a commercial vehicle with hundreds of bags would be used to "justify a warrantless search of every bag" does not strike me as more than a stone's throw down the road. Even if we stretched to assume that Hemi's "general alert" constituted sufficient proof that 1 out of 7 of the bags contained drugs, it does not seem obvious to me that an officer is justified to search each bag based on the approximately 14 percent chance that that bag is the one that contains contraband.